[Crim. No. 21311. Aug. 13, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID L. GHENT, JR., Defendant and Appellant.

## Counsel

Robert D. Carrow, under appointment by the Supreme Court, and Brian J. Wrobel for Defendant and Appellant.

John K. Van de Kamp and George Deukmejian, Attorneys General, Steve White and Robert H. Philibosian, Chief Assistant Attorneys General, John H. Sugiyama, Edward P. O'Brien and William D. Stein, Assistant Attorneys General, Herbert F. Wilkinson, Thomas A. Brady, Charles J. James and Dane R. Gillette, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

LUCAS, C. J.—Defendant David L. Ghent, Jr., appeals from a judgment imposing the death penalty following his conviction of first degree murder and attempted rape of Patricia Bert, and assault with intent to commit rape of Mrs. Preskitt. (See Pen. Code, §§ 187 [murder], 261 [rape], and 220 [assault to commit rape]; all further statutory references are to this code.) Defendant was tried under the 1977 death penalty law (see Stats. 1977, ch. 316, § 5 et seq.). Although the original jury was deadlocked regarding the special circumstances allegation (murder committed during a rape or attempted rape; see former § 190.2, subd. (c)(3)(iii)), a subsequent jury (see § 190.4 subd. (a)) found the allegation to be true and thereafter returned a verdict imposing the death penalty. As will appear, we conclude that the judgment should be affirmed.

Because defendant does not challenge the sufficiency of the evidence to support his conviction of the foregoing offenses, we only summarily review the facts underlying those offenses.

During the early morning hours of February 21, 1978, defendant entered the bedroom of Mrs. Preskitt, an acquaintance and housemate, jumped onto her bed and, despite her struggling and screaming, straddled her body and requested a sex act. His efforts were interrupted by the entry of Mrs. Presk-

itt's child, and following an additional incident wherein defendant pursued Mrs. Preskitt while carrying a pair of scissors, he eventually left the house around 5 a.m. (The foregoing facts led to defendant's conviction of assault with intent to commit rape.)

Shortly thereafter, defendant arrived at the home of some other acquaintances, Paul and Patricia Bert, assertedly to ask Paul's help in finding defendant a job. Patricia indicated that her husband had already left for work and defendant asked her for his work telephone number. While writing the number on a note pad, defendant observed Patricia's robe fall open, revealing her naked body. According to defendant's own testimony, his next memory was that he was standing over Patricia's dead, nude body with a bloody knife in his hand. The victim's hands were tied behind her back.

Defendant further testified that, upon reflecting upon his apparent deed, he vomited in a toilet, lifted the telephone to call the police, became "scared," hung up the telephone and left the house. Shortly thereafter, however, he returned, removed his fingerprints from the Bert household and retrieved the murder weapon. He again left the house, changed his bloodstained pants at a friend's home, and threw away both the pants and the knife. (Under the prosecutor's view of the evidence, defendant raped and killed Mrs. Bert when he *returned* to the house, after ample time had expired within which to deliberate and premeditate.)

An autopsy surgeon counted 21 stab wounds in Patricia's neck and chest. According to a prosecution expert, spermatozoa in her genital cavity came from a Group B type "donor" such as defendant (the Berts both had Group A type blood). A defense expert attempted to cast doubt upon the testing of the semen samples. Defendant's primary defenses at trial were his lack of deliberation and premeditation, and insufficiency of the evidence to establish forcible rape. No attempt was made to suggest that anyone other than defendant had attacked and killed Mrs. Bert.

Following the separate guilt and special circumstances trials, a penalty trial was held. The prosecutor introduced evidence regarding defendant's prior assaults and sex offenses. The defense introduced mitigating evidence of defendant's background and character. As indicated above, the jury returned a verdict imposing the death penalty. The present appeal is automatic. (§ 1239, subd. (b).)

Defendant makes a variety of contentions on appeal. We first consider the asserted errors occurring at the guilt trial.

GUILT PHASE CONTENTIONS

1. *Miranda Violation*

Following defendant's arrest, he was interrogated by Officers DeSart and Pate of the Santa Clara County Sheriff's Department. Although he originally waived his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), at several points during the interrogation he indicated that he desired the assistance of an attorney. Despite his request, the interrogation proceeded, culminating in defendant's agreement to be examined by Dr. Shoor, a psychiatrist previously retained by the department. Shoor readvised defendant of his *Miranda* rights and then spent approximately 45 minutes examining him.

At defendant's guilt phase trial, and again at the second special circumstances trial, both Officer DeSart and Dr. Shoor testified briefly regarding defendant's apparent mental state at the time of the interrogation. Defendant now contends that the foregoing testimony was inadmissible by reason of a violation of *Miranda* principles. We agree, but we conclude that the error was harmless under the circumstances here.

On direct examination, Officer DeSart testified, without elaboration, that defendant showed no apparent signs of any mental defect, and that he seemed "oriented" during his interrogation. Doctor Shoor testified, also without extensive discussion, that, in his opinion, defendant disclosed normal mental capacities, including the ability to premeditate and deliberate. As no evidence of insanity, intoxication, mental disease or defect was introduced by the defense, the foregoing testimony was relevant primarily to the issue of defendant's ability to commit a "willful, deliberate and premeditated" murder, a prerequisite to sustaining a special circumstances finding under the 1977 death penalty law. (See former § 190.2, subd. (c)(3)(iii).)

It does appear that a *Miranda* violation occurred here. Once defendant requested an attorney to assist him, all further interrogation should have ceased. (*People* v. *Pettingill* (1978) 21 Cal.3d 231, 237-239 [145 Cal.Rptr. 861, 578 P.2d 108].) Interrogating officers may not simply ignore a suspect's invocation of his *Miranda* rights and resume the interrogation at a later time after obtaining a new *Miranda* waiver. (See *People* v. *Smith* (1983) 34 Cal.3d 251, 264-268 [193 Cal.Rptr. 692, 667 P.2d 149]; *Pettingill, supra,* at pp. 240-241; but see *Michigan* v. *Mosely* (1975) 423 U.S.96, 104-106 [46 L.Ed.2d 313, 321-323, 96 S.Ct. 321] [contrary federal rule].) The People do not dispute that Dr. Shoor was a police agent whose "interview" constituted a continuation of the prior interrogation. We conclude that Dr.

Shoor's interrogation was not insulated from attack by reason of the renewed *Miranda* advice he gave to defendant.

Both Officer DeSart and Dr. Shoor were permitted to testify regarding the content of certain statements made by defendant during the course of their respective interrogations, but our examination of the record indicates that none of these statements was inculpatory or could have affected the verdicts against defendant. As indicated above, however, both witnesses also testified regarding defendant's apparent mental condition during the interrogations. We have held that such testimony is inadmissible if it relates to an interrogation conducted in violation of *Miranda*. (*People* v. *Rucker* (1980) 26 Cal.3d 368, 386-387, 390-391 [162 Cal.Rptr. 13, 605 P.2d 843]; see *People* v. *Walker* (1972) 29 Cal.App.3d 448, 452-455 [105 Cal.Rptr. 672].)

In *Rucker,* the prosecution attempted to rebut a defense of diminished capacity by introducing evidence of two "interviews" with the defendant by police officers and a probation officer. There, as here, the officers continued the interview despite the defendant's repeated requests for an attorney. Although Rucker's responses to questioning appeared exculpatory, his answers and attitude during the interviews indicated that he was functioning normally and responsively. We held that Rucker's responses were "testimonial" under self-incrimination principles (26 Cal.3d at pp. 378-386), that the interviews amounted to "interrogations" governed by *Miranda* rules (*id.,* at pp. 386-387), that *Miranda* renders the defendant's statements inadmissible even on rebuttal following his presentation of a diminished capacity defense (*id.,* at pp. 389-391), and that the error was prejudicial on examination of the record (*id.,* at p. 391).

In *Rucker,* we explained that it was not "significant" that the probation officer testified in most part regarding his own impressions and opinions about the defendant's responsiveness to questioning, rather than relating the content of defendant's statements themselves. We stated, among other things, that such opinion testimony would be deemed inadmissible "as a fruit of the illegal interrogation." (P. 387, fn. 16.)

*Rucker* is therefore controlling on the question of the admissibility of DeSart's and Shoor's testimony regarding defendant's mental state. Under *Rucker,* the *Miranda* violation tainted both these witnesses' observations based, as they were, on defendant's responses to illegal interrogations conducted by those witnesses. (Cf. *People* v. *Whitt* (1984) 36 Cal.3d 724, 748, fn. 21 [205 Cal.Rptr. 810, 685 P.2d 1161] [exercise of *Miranda* rights precludes testimony regarding defendant's mental condition at time of interview].)

Was the error prejudicial? Our review of the record indicates that, unlike the situation in *Rucker* (see 26 Cal.3d at p. 391), introduction of the testimony of witnesses DeSart and Shoor was harmless error, whether a *Watson* test (*People* v. *Watson* (1956) 46 Cal.2d 818, 831 [299 P.2d 243]; see *Rucker, supra,* at p. 391) or a *Chapman* test (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; see *Estelle* v. *Smith* (1981) 451 U.S. 454, 468-469 [68 L.Ed.2d 359, 372-373, 101 S.Ct. 1866]) is used. This testimony related primarily to defendant's ability to deliberate and premeditate prior to the murder—defendant had no other defense. Such evidence was irrelevant to the charges which did not require such mental capacity, including attempted rape, rape or felony murder. Thus, with respect to the *first* trial, culminating in guilty verdicts of first degree murder and attempted rape, admission of DeSart's and Shoor's testimony was clearly harmless in light of the overwhelming evidence that a felony murder had occurred, namely, a murder committed in the attempted perpetration of a rape (§ 189).

As for the *second,* special circumstances trial, the issues of premeditation and deliberation were indeed presented, being prerequisites to sustaining a special circumstances finding under the 1977 death penalty law applicable here. But, as we explain, DeSart's and Shoor's brief testimony at that trial could not possibly have had a critical impact upon the jury in light of the other evidence presented on the issues of premeditation and deliberation. We summarize the evidence elicited at the second trial, as follows:

a. *Officer DeSart's Testimony.* The officer's testimony regarding defendant's mental capacity was strikingly minimal. As indicated above, DeSart merely affirmed that defendant did not seem disoriented, and that the only sign of any mental defect or memory lapse was that defendant seemed unable to keep track of the lies he was telling. In light of the plethora of expert testimony on these issues, such lay testimony could not have swayed the jury in appraising defendant's capacity to premeditate or deliberate at the time of the murder.

b. *Doctor Shoor's Testimony.* Although Shoor's testimony was more germane to the premeditation issue, it too was so minimal that the jury could not have been influenced by it. Shoor testified that, based on his 45-minute interview with defendant, he was able to premeditate and deliberate, and that his mental capacities were well within the range of normal, reasonable thinking. Shoor's entire direct examination testimony on this issue consumed only eight lines of transcript. Defense counsel's cross-examination was similarly brief, merely exploring the nature of Shoor's examination technique and its possible limitations. Shoor gave no reasons or explanation to support his bare opinion regarding defendant's mental capacity. In rela-

tion to the *remainder* of the evidence on the subject of premeditation, DeSart's and Shoor's testimony was wholly de minimis. More important, neither DeSart's nor Dr. Shoor's testimony regarding defendant's apparent *capacity* to premeditate and deliberate was truly inconsistent with the defense theory, discussed below, that defendant's inability to premeditate or deliberate was *situational* and temporary, triggered while viewing Mrs. Bert's nude body. Thus, neither DeSart's nor Dr. Shoor's testimony involved any critical elements of the defense case. Under the defense theory, defendant indeed may have had a general capacity to deliberate which was temporarily circumvented during the slaying.

c. *Defendant's Witnesses on Premeditation.* Defendant's chief witnesses on the issue were Doctors Raffle and Delman who expounded at length regarding their examination and testing of defendant and the basis for their shared opinion that defendant lacked the ability to premeditate or deliberate *during the murder*. It was the defense's primary theory that although defendant's attempt to rape his victim may have been deliberate and premeditated, he lost that ability (and all memory of the murder) once her robe fell open exposing her naked body and a sudden impulse precipitated defendant's attack. In contrast to DeSart's and Shoor's brief and conclusory testimony, which was confined to the issue of defendant's general *capacity* to premeditate, Dr. Raffle's testimony covered nearly 200 pages.

Rather than recall either DeSart or Shoor to rebut Raffle's and Delman's testimony, the prosecutor relied on cross-examination of these witnesses, and evidence of the offense itself: As the uncontradicted evidence disclosed, defendant, after being frustrated in one attempt to obtain sexual satisfaction, proceeded to his second victim's house where, after learning that she was alone, he proceeded to tie her hands behind her back, attempted to rape her and ultimately stabbed her repeatedly until she died.

Our review of the record convinces us that the jury's verdict, including its finding of a premeditated and deliberate murder, was based exclusively on the nature of the offense, coupled with its rejection of the "lost memory" theories of Drs. Raffle and Delman. Beyond a reasonable doubt, exclusion of DeSart's and Shoor's minimal and unsubstantiated opinions on the subject of defendant's general capacity to premeditate could not possibly have affected the jury's verdict. Accordingly, any *Miranda* error was harmless.

2. *Denial of Representative Jury*

Defendant next contends that the exclusion for cause of persons automatically opposed to the death penalty deprived him of the right to a jury chosen from a representative cross-section of the community. We have

rejected this claim. (*People* v. *Fields* (1983) 35 Cal.3d 329, 342-353 (plur. opn.), 374-375 (conc. opn.) [197 Cal.Rptr. 803, 673 P.2d 680]; see also *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758]).)

3. *Denial of Individualized, Sequestered Voir Dire*

Defendant argues that the judgment should be reversed because the trial court refused to order that the "death-qualification" of the prospective jurors be conducted individually and in sequestration, as required by *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301]. The present case was tried before *Hovey* was decided, however, and our decision in that case expressly recites that individual and sequestered voir dire would be required only "in future cases." (*Ibid.*)

4. *Failure to Preserve Evidence*

To support his theory that defendant raped Mrs. Bert, the prosecutor introduced expert testimony to the effect that semen found in the victim's vagina was consistent with defendant's blood type but different from Mr. or Mrs. Bert's blood type. The defense's own expert was given a semen sample to test but it produced results which, according to the expert, did not implicate defendant. On rebuttal, however, the People explained that the sample sent to the defense expert probably had deteriorated from thawing while in the possession of the police expert and while being mailed to the defense.

Defendant argues that the People "mishandled" the semen sample and failed to preserve it for meaningful defense testing. (See *People* v. *Nation* (1980) 26 Cal.3d 169, 176-177 [161 Cal.Rptr. 299, 604 P.2d 1051] [police must take reasonable measures to preserve semen samples]; *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361].) The People contend, however, that the police and their expert took reasonable care of the sample, and that any thawing was the necessary result of testing or transporting the sample from one location to another.

The record supports the conclusion that there was no failure by the People to preserve the physical evidence resulting from the vaginal wash, and that the prosecution's evidence concerning the laboratory test on the semen sample was properly admitted. Accordingly, the evidence that the semen found in the victim's vagina was consistent with defendant's blood type was likewise properly admitted into evidence as proof of defendant's guilt.

Mrs. Bert was killed during the morning of February 21, 1978. Her body was discovered after noon on the same day. The autopsy was performed on

February 22 and a vaginal wash to detect the presence of semen was performed at the autopsy. The pathologist noted the presence of semen, froze the sample and sent the frozen material to the Santa Clara crime laboratory.

Upon a request for independent analysis by the defense a sample was provided to the Institute of Forensic Sciences in Oakland. Michael Grubb, a criminalist employed there, analyzed the specimen. Testimony from this defense witness confirms that the prosecuting authorities preserved and provided the vaginal semen sample to the defense expert. The record contains the following testimony by Mr. Grubb: "[By Mr. Green:] Q: Well, Mr. Grubb, this—you say your B result in July with Inami was slightly stronger than the B result you had gotten earlier?

"A: Yes.

"Q: What can account for the—becoming slightly stronger?

"A: Well, his sample had been kept, from the time it was collected, except for his thawing when he did his initial result, he kept it frozen, which is the best way to keep it. When he sent the sample that I was to analyze, he didn't send it to my attention and it sat in our front office for about four days before they could figure out where it should be routed. That, in itself, I would think is enough to slightly alter the result. But that's speculating."

It is clear from the testimony of both Michael Grubb and Henry Inami, the county criminalist, that a vaginal sample can deteriorate when it is thawed after freezing. Although the sample was frozen and maintained in that condition between testings, it was thawed on several occasions, either during the tests, transmission to the court for the preliminary hearing or shipment to Grubb. This thawing could have deteriorated the sample and diminished the B antigen activity, thus explaining the differing test results which Inami and Grubb reported.

We conclude, nonetheless, that the state took "reasonable measures to adequately preserve" the evidence. (See *People* v. *Nation, supra,* 26 Cal.3d 169, 177.) The fact that the sample may have deteriorated over time, or as a possible consequence of permissible testing procedures, was not evidence of *Hitch-Nation* error. To the extent that the defense laboratory's failure to refrigerate the sample immediately upon receipt affected Grubb's test results, defendant, not the prosecution, is responsible. (See *People* v. *Nation, supra,* at p. 177; *People* v. *Newsome* (1980) 136 Cal.App.3d 992, 1002 [186 Cal.Rptr. 676].)

In light of our holding, we need not consider whether the loss of accurate semen samples was harmless to the defense given the jury's verdict of

*attempted* rape, and the substantial additional evidence of such an offense, including defendant's prior uninvited sexual advances and aggression toward Mrs. Preskitt, his consequent entry into Mrs. Bert's home, his traumatic viewing of her naked body, his tying her hands behind her back, and the fact that her body was entirely nude when later discovered by the officers. (See *People* v. *Hillery* (1965) 62 Cal.2d 692, 704-705 [44 Cal.Rptr. 30, 401 P.2d 382].)

5. *Incompetence of Trial Counsel*

As indicated above, defendant's first trial culminated in a verdict of first degree murder and attempted rape, but the jury was unable to agree upon the felony-murder special circumstances allegation, which required a finding that the murder was willful, deliberate and premeditated. (Former § 190.2, subd. (c)(3)(iii).) Defendant now complains of trial counsel's failure, in connection with the *first* trial, to furnish the defense psychiatrist, Dr. Raffle, all of the records of defendant's prior sex offenses, which records were needed to prepare a satisfactory diminished capacity defense, and to respond to the prosecutor's efforts to impeach Dr. Raffle.

The record indicates that the defense relied upon Dr. Raffle solely to negate the elements of premeditation and deliberation with respect to the *murder* charge. Dr. Raffle stated several times that he was not suggesting that defendant lacked the ability to deliberate or premeditate regarding his rape or attempted rape of the murder victim. Thus, any lack of preparation by defense counsel affected only the special circumstances allegation which, as previously noted, was the subject of defendant's *second* trial. Lack of premeditation or deliberation was no defense to the attempted rape or felony murder overwhelmingly established by the prosecution in the first trial. Accordingly, any incompetence of counsel in preparing Dr. Raffle for the first trial did not deprive defendant of a potentially meritorious defense. On retrial of the special circumstance allegation, Dr. Raffle was fully prepared to meet any impeachment attempts by the prosecution based on defendant's prior offenses.

6. *Failure to Instruct on Lesser-included Offenses*

Defendant contends the trial court erred in failing to instruct the jury at the first trial, sua sponte, regarding certain lesser-included offenses of rape in addition to attempted rape, as those offenses related to victim Bert. (The jury was instructed regarding assault with intent to commit rape as to victim Preskitt.) These lesser offenses assertedly would have included assault with intent to commit rape, battery and simple assault.

As defendant observes, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence, that is, principles closely and openly connected with the facts before the court and which are necessary for the jury's understanding of the case. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913].) No sua sponte obligation exists, however, when there is no evidence that the offense was less than that charged. (*Ibid.*; see *People* v. *Noah* (1971) 5 Cal.3d 469, 479 [96 Cal.Rptr. 441, 487 P.2d 1009].)

Our review of the record indicates that, contrary to defendant's assertion, there was no need to instruct on any offenses other than murder, rape and attempted rape. As explained above, defendant did not deny committing such offenses; instead, he testified that he had no recollection of the time period following his viewing Mrs. Bert's nude body. The People's evidence of rape or attempted rape was strong, including the fact that Mrs. Preskitt had recently thwarted defendant's sexual advances, Mrs. Bert's body was nude, her hands had been tied behind her back, and there was spermatozoa, possibly of defendant's blood type, in the victim's vaginal cavity. (See *People* v. *Hillery, supra,* 62 Cal.2d 692, 704-705.)

As the People suggest, under the evidence defendant was guilty of "rape or attempted rape or nothing." Accordingly, under the foregoing principles, the trial court was not required to instruct regarding any additional lesser offenses. We observe that an instruction on the offense of assault with intent to rape Mrs. Bert would not have assisted defendant, for as we stated in *People* v. *Rupp* (1953) 41 Cal.2d 371, 382 [260 P.2d 1], "[A]n assault with intent to commit rape is merely an aggravated form of an attempted rape, the latter differing from the former only in that an assault need not be shown. [Citation.] 'An "assault" with intent to commit a crime necessarily embraces an "attempt" to commit said crime . . . .' [Citation.]" Here, as in *Rupp,* "The evidence in the record reasonably shows the commission of no crime other than a killing in an attempt to perpetrate rape." (*Ibid.*; but see *People* v. *Ramirez* (1969) 2 Cal.App.3d 345, 352-354 [82 Cal.Rptr. 665].)

7. *Instructions on Use of Jury Notes*

At both the guilt and special circumstances trials, various members of the jury took written notes of the proceedings. The trial court cautioned the jury following both trials that these notes were the jurors' personal notes which should be used in the jury room for the sole purpose of refreshing their recollection. Defendant now contends that the court's admonition was inadequate because it failed to warn the jurors in advance that their note-taking should not distract them from the ongoing proceedings, that their notes should not take precedence over their own independent recollection,

that jurors who do not take notes should not be influenced by another juror's notes, and that in the event of any discrepancy between their notes and their recollection, the jurors should request a rereading of the transcript.

We recently indicated in *People* v. *Whitt, supra,* 36 Cal.3d 724, 746-747, that "the better practice" would be to give a cautionary instruction containing the admonitions suggested by defendant. On the other hand, *Whitt* declined to find the failure to give a more detailed cautionary instruction preudicial in light of the overwhelming evidence of defendant's guilt. (*Id.,* at p. 748.) Likewise, in the present case it does not seem reasonably probable that the jury's guilt or special circumstances findings were affected by the trial court's failure to give a more thorough admonition regarding the dangers of notetaking. As defendant acknowledges, in addition to the instruction which was given, defense counsel also cautioned the jurors not to place undue reliance upon their notes, and asked them to request a reading of the transcript in case of any doubt or discrepancy. There is no indication in the record that the jurors' notetaking distracted or improperly influenced them in any way. We cannot presume prejudice in the face of such a silent record.

8. *Severance or Exclusion of Evidence Regarding Preskitt Offense*

Prior to trial, defendant moved to sever the Preskitt assault count from the Bert murder and attempted rape counts. The trial court denied the motion, and defendant sought pretrial writ review. The Court of Appeal, in *Ghent* v. *Superior Court* (1979) 90 Cal.App.3d 944, 958 [153 Cal.Rptr. 720] (*Ghent I*), concluded that the trial court did not abuse its discretion in denying severance, and we denied a petition for hearing. Defendant purports to renew his contention here.

The Court of Appeal in *Ghent I* observed that the Preskitt and Bert offenses were "connected together in their commission" (§ 954), sharing common elements of substantial importance (see *People* v. *Matson* (1974) 13 Cal.3d 35, 39 [117 Cal.Rptr. 664, 528 P.2d 752]), namely, sexual motivation and contemporaneous commission. As the Court of Appeal noted, "The time element is important because the frustration of the sexual attack at 5 a.m. inferably provided a motive for the rape committed shortly thereafter. [¶] These factors . . . override the prospect of prejudice, which respondent court can effectively control at the single trial. No abuse of discretion appears . . . ." (90 Cal.App.3d at p. 958.)

The People urge us to hold that *Ghent I* has become "law of the case" and cannot be attacked on appeal. The People's contention would be valid if

no contrary controlling decisions have intervened, and if application of the law of the case doctrine would not lead to an "unjust" decision. (See *People* v. *Shuey* (1975) 13 Cal.3d 835, 845-846 [120 Cal.Rptr. 83, 533 P.2d 211].) As we made clear in *Shuey,* the "unjust decision" exception applies only where a "manifest misapplication of existing principles resulting in substantial injustice" has occurred. (P. 846.)

Although several severance decisions have intervened since *Ghent I* was decided (see *People* v. *Smallwood* (1986) 42 Cal.3d 415, 422-434 [228 Cal.Rptr. 913, 722 P.2d 197]; *People* v. *Balderas* (1985) 41 Cal.3d 144, 170-177 [222 Cal.Rptr. 184, 711 P.2d 480]; *Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 447-454 [204 Cal.Rptr. 700, 683 P.2d 699]), the principles announced in those cases were neither contrary to, nor manifestly misapplied in, *Ghent I.* Accordingly, no reason appears for permitting defendant to attack *Ghent I's* holding.

Without unnecessarily prolonging this opinion, all three cases stress the importance of cross-admissibility. As stated in *Smallwood,* "If the two offenses are cross-admissible, there will probably be little or no prejudice from joinder." (42 Cal.3d at p. 425.) As noted above, *Ghent I* concluded that the common elements of sexual motivation and contemporaneous commission overrode any possible prejudice to defendant; indeed, evidence of the Preskitt sexual assault was cross-admissible to show defendant's motive for attacking Mrs. Bert. No manifest misapplication of correct legal principles occurred here; accordingly, the law of the case doctrine applies to bar defendant from renewing his challenge to the severance ruling.

Defendant disputes *Ghent I's* premise that the Preskitt incident was admissible to show defendant's motive regarding Mrs. Bert. He argues that "evidence that appellant committed an act of sexual assault upon Ms. Preskitt would have no tendency to show a motive for the murder or rape of Ms. Bert." The argument is frivolous, given the contemporaneity of the two events and the evidence indicating that defendant's sexual advances were frustrated during his earlier encounter.

We must likewise reject defendant's argument that the trial court erred in denying his motion, prior to the second special circumstances trial, to exclude the Preskitt evidence as unduly prejudicial when compared with its probative value. (Evid. Code, § 352.) The special circumstance charge rested on allegations of a murder committed during the course of a rape or attempted rape. The Preskitt evidence obviously was highly probative of defendant's motive or intent to commit the underlying felony. We observe that the trial court properly gave a cautionary instruction which explained that the Preskitt evidence was admitted for the "limited purpose" of prov-

ing motive or intent, and not to prove that defendant was a person of bad character with a disposition to commit such crimes.

## Special Circumstances Contentions

### 1. *Double Jeopardy Violation*

As previously indicated, at defendant's first trial, the jury convicted him of first degree murder, attempted rape (Mrs. Bert) and assault with intent to commit rape (Mrs. Preskitt). Because the jury was unable to agree on a verdict as to the special circumstances allegation, a second trial was held to resolve that issue. Retrial was ordered pursuant to former section 190.4, subdivision (a), the fifth paragraph of which provides as follows: "In any case in which the defendant has been found guilty by a jury, and the jury has been unable to reach a unanimous verdict that one or more of the special circumstances charged are true, and does not reach a unanimous verdict that all the special circumstances charged are not true, the court shall dismiss the jury and shall order a new jury impaneled to try the issues, *but the issue of guilt shall not be tried by such jury,* nor shall such jury retry the issue of the truth of any of the special circumstances which were found by a unanimous verdict of the previous jury to be untrue . . . ." (Italics added.)

The special circumstance allegation in the present case involved a charge of willful, premeditated and deliberate murder committed during a rape or attempted rape. At the second trial, the trial court advised the new jury that defendant already had been found guilty of the first degree *murder* of Mrs. Bert. However, with the concurrence of both counsel, the new jury was not advised of defendant's conviction of the *attempted rape* of Mrs. Bert. Accordingly, the issue of rape/attempted rape was retried as part of the special circumstances issue.

Defendant, while agreeing to retrial of the attempted rape charge, objected to allowing the prosecution a second chance to establish the rape of Mrs. Bert. The prosecutor argued, however, that no actual retrial of the rape issue was involved, that the original attempted rape conviction would stand, and that in any event all evidence tending to show rape likewise was admissible to show attempted rape. The trial court overruled defendant's objection and instructed the jury on both actual and attempted rape. Thereafter, the jury found that the special circumstances allegation was true, without specifying whether its finding was based on an actual or attempted rape.

Defendant now contends that the special circumstances finding must be reversed because defendant was "twice placed in jeopardy" on the

rape charge. According to defendant, the initial conviction of attempted rape constituted an implied acquittal of actual rape. (See *In re Hess* (1955) 45 Cal.2d 171, 176 [288 P.2d 5].) Yet defendant was nonetheless "required to defend against a considerable body of evidence relevant to a charge of actual rape but irrelevant had the scope of the issue been limited to attempted rape."

We conclude that the trial court's procedure could not have prejudiced defendant. Indeed, as we construe former section 190.4, the trial court simply could have advised the jury that defendant already had been convicted of both murder *and* attempted rape of Mrs. Bert, and entirely excluded consideration of the rape/attempted rape issue from the jury on retrial. Where a defendant has been found guilty of first degree murder together with other felonies relevant to a special circumstance charge, no purpose whatever is served by requiring retrial of those felonies, and section 190.4 reasonably may be construed as precluding their relitigation.

Thus, defendant was given a second undeserved "bite" at the attempted rape "apple" and cannot complain that he was compelled to relitigate the issue. Moreover, it is difficult to see in what manner such procedure possibly could have harmed him, even assuming that relitigation of the attempted rape issue was required by law. Evidence of actual rape (including vaginal semen samples implicating defendant) was admissible on the issue of attempted rape, disclosing defendant's sexual motive or intent. (Cf. *People* v. *Esposti* (1947) 82 Cal.App.2d 76, 78 [185 P.2d 866].) A guilty verdict on *either* offense would have sustained a special circumstances finding, assuming the jury found in addition a premeditated, deliberate murder. Additionally, it is highly unlikely that relitigation of the rape issue influenced the jury's penalty decision, in light of the admissibility of the evidence on the issue of attempted rape. We conclude that defendant's double jeopardy argument is without merit.

2. *Prosecutorial Misconduct*

*Impugning Integrity of Defense Counsel.* At the second trial, while cross-examining defense psychiatrist Dr. Raffle, the prosecutor asked a series of questions which suggested that defendant may have lied to Raffle in relating the sequence of events bearing on his mental state. The prosecutor also suggested through his questions that defense counsel probably had explained to defendant the "law of the case" in such a manner as to make it clear to defendant the consequences of his testimony as it pertained to the premeditation/deliberation issue. ("[Y]ou say, look, if it happened this way, you're going to get nailed. If it happened this way, you might not. Now

which way did it happen? Isn't he [defendant] smart enough to figure out which way it happened after that's explained to him?")

Our review of the testimony does not support defendant's position that the prosecutor was impugning defense counsel's honesty or integrity. (See *People* v. *Bain* (1971) 5 Cal.3d 839, 847 [97 Cal.Rptr. 684, 489 P.2d 564] [unsupported implication that defense counsel fabricated a defense].) The prosecutor's inquiry merely sought to determine whether defendant himself was capable of fabricating testimony based on his counsel's explanation of the law and its alternative consequences. In any event, although defense counsel objected to some of the prosecutor's questioning in this regard, he did not request an instruction or admonition to lessen any possible prejudicial effect on the jury. (See *People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].) As *Green* teaches, the asserted objection was thereby waived.

3. *Felony-murder Rule Invalid*

Defendant urges that the felony-murder rule creates an unconstitutional presumption of malice, a contention we rejected in *People* v. *Dillon* (1983) 34 Cal.3d 441, 446 [194 Cal.Rptr. 390, 668 P.2d 697]. In this connection, we observe that we are not faced with the issue presented in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], wherein we required proof of an intent to kill or aid in a killing in order to sustain a felony-murder special circumstance finding under the 1978 death penalty law (§ 190.2, subd. (a)(17)). In the present case, defendant was tried under the 1977 law, and the jury was instructed that to sustain a special circumstance finding in this case, it must find that (as required by former § 190.2, subd. (c)(3)) defendant's murder was committed "with intent to cause death" and was "willful, deliberate and premeditated." Such instructions amply met *Carlos*'s demands. (See *People* v. *Phillips* (1985) 41 Cal.3d 29, 59-60 [222 Cal.Rptr. 127, 711 P.2d 423]; *People* v. *Sedeno, supra,* 10 Cal.3d 703, 721.)

As stated in *Phillips,* "a jury verdict of willful, deliberate and premeditated murder necessarily embraces" a finding of intent to kill. (41 Cal.3d at p. 59.)

4. *Absence of "Special Finding" of Existence of Special Circumstance*

Former sections 190.2 and 190.4, subdivision (a), required a "special finding" of the truth of each special circumstance charged. Defendant herein was charged with the sole special circumstance of felony murder based on rape or attempted rape. After being adequately instructed on the

essential elements or prerequisites of a special circumstance finding, the jury adopted a special finding that the "special circumstances, as charged in the information" are true. Defendant now contends that this finding was insufficient in that it failed to include additional findings regarding each of the underlying elements (i.e., a premeditated murder, defendant's personal presence, and an intentional killing during rape or attempted rape).

The statutory provisions at issue did not require any specific findings beyond the ultimate determination whether the special circumstances were true. (*People* v. *Davenport* (1985) 41 Cal.3d 247, 273-275 [221 Cal.Rptr. 794, 710 P.2d 861].) Such a finding was made in the present case, and there is no indication in the record that the jurors failed to understand or apply the trial court's detailed and accurate instructions regarding the essential elements of the felony-murder special circumstance charged here.

5. *Faulty Instructions Regarding Defendant's Failure to Explain*

Defendant complains that the trial court at the second trial misread an instruction (CALJIC No. 2.62) in such a manner as to prejudice him. The instruction pertained to the inferences that might be drawn from a defendant's failure to explain or deny prosecution evidence of facts within his personal knowledge. It correctly explained that defendant has a constitutional right to decline to testify, but that his failure to deny or explain facts within his personal knowledge may be considered as supporting the prosecution evidence at issue. It also correctly advised that such failure to deny or explain does not create any presumption or warrant any inference of guilt, or relieve the prosecution of its proof burden.

The instruction, as read to the jury, also stated, however, that if defendant lacked the knowledge needed to deny or explain prosecution evidence against him, "it would be reasonable [*sic*] to draw the inference unfavorable to him because of the failure to deny or explain such evidence." Defendant correctly observes that the foregoing portion of the instruction should have used the word "unreasonable" rather than "reasonable." Indeed, a correct version of the instruction apparently was submitted by counsel to the trial court. Nevertheless, in light of the entire instructions on the subject, it is clear that the inadvertent mistake could not have prejudiced defendant. No reasonable juror would have believed that unfavorable inferences could be drawn against defendant based on his failure to deny or explain facts *unknown* to him.

6. *Faulty Premeditation Instructions*

At the second special circumstances trial, the court instructed the jury regarding the issues of premeditation and deliberation. (Former CALJIC

No. 8.86.) Taking a single sentence out of context, defendant argues that the trial court essentially directed the jury to find that the Bert murder was willful, deliberate and premeditated. The point is frivolous. The sentence in question ("It was willful, deliberate and premeditated murder") is contained in a paragraph explaining in the abstract the *prerequisites* of a finding of premeditated murder, i.e., "one formed under preexisting reflection and not under the sudden heat of passion or condition precluding the idea of deliberation. It was willful, deliberate and premeditated murder."

It is true that the instruction evidently was garbled somewhat, either in reading it to the jury, or in transcribing its text for the record. But any confusion was necessarily eliminated when the trial court subsequently *correctly* reread the instruction. The jury could not have been misled into thinking that the court was directing a finding of premeditation in this case.

7. *Faulty Attempted Rape Instructions*

Defendant next challenges certain instructions given at his second trial with respect to the offense of attempted rape. The trial court properly instructed the jury that the crime is not committed if, despite his intent to rape, defendant freely and voluntarily abandoned his original intent before committing any act toward the ultimate commission of the rape. (See CALJIC No. 6.02.) The court also instructed the jury that "If a person is prevented from committing an act . . . he cannot avoid the responsibility by not proceeding further with his intent to commit the crime either by reason of voluntarily abandoning [its] purposes or because he was prevented from or interfered with in completing a crime." This latter instruction appears to be a modified, and possibly garbled, version of CALJIC No. 6.01, which explains that once an attempted rape has occurred, the actor cannot avoid responsibility by not proceeding further with the crime, either by reason of voluntarily abandoning it or being prevented from completing it.

Defendant argues that the modified instruction "substantially diluted" the abandoned intent instruction and improperly suggested to the jury that he could be found guilty of rape or attempted rape, even though he abandoned his intent to commit rape, merely because he was somehow prevented from completing the act.

First, as we previously observed, defendant was properly convicted of attempted rape in his *first* trial, and the issue of his guilt of that offense should not have been retried by the jury in the second trial. Defendant does not suggest that the attempted rape instructions at his first trial were flawed in any way. Moreover, the jury was properly instructed at the second trial

on the remaining attempted rape issues, including the necessity of finding a union of act and intent, as well as a specific intent to commit rape. The challenged instruction was followed immediately by the correct instruction that "If the person intends to commit a rape, but before he commits any act towards the ultimate commission of the rape, he freely and voluntarily abandons his original intent and makes no effort to accomplish it, the crime of attempt has not been committed." Under the circumstances, any error in instructing on abandonment of criminal intent was clearly harmless.

8. *Faulty Instructions on Prior Inconsistent Statements*

At the completion of the second trial, and prior to the penalty phase, the jury was instructed on the subject of a witness's prior inconsistent statements. The jury was properly told that evidence of a witness's prior statement (whether consistent or inconsistent with his present testimony) may be considered both to test his credibility and as evidence of the truth of the facts as stated on the former occasion. (CALJIC No. 2.13.) The jury was further advised that "If you *believe* a witness's testimony that he no longer remembers a certain event, such testimony is inconsistent with the prior statement or statements by him describing that event." (Italics added.)

Defendant takes issue with the foregoing variation on CALJIC No. 2.13, which uses the word "disbelieve" instead of "believe." We agree that the modification seems to make little sense, for the fact that a witness presently cannot recall an event, if believed, nevertheless logically casts no serious doubt upon, nor reinforces, that witness's prior description of the event. (*Disbelief* of the witness's memory lapse, however, might well support an inference of the truth of the facts formerly recited.)

Defendant contends that the instruction in effect told the jury that even if it believed his supposed memory lapse during the murder of Mrs. Bert, it could consider that testimony inconsistent with (and thus impeachable by) his prior statements to Dr. Raffle to the effect that indeed he remembered raping and stabbing his victim. To the contrary, no reasonable juror would have assumed that defendant's credibility could be impeached by a *believable* memory loss. It is not reasonably probable that the error contributed to the jury's verdict.

9. *Defendant's Statements Relevant to Premeditation*

During the retrial of the special circumstances charge, and following defendant's denial of any memory of raping or stabbing Mrs. Bert to death, the prosecutor on cross-examination asked defendant whether he had ever told anyone that he liked seeing people bleed to death. Defendant's counsel

made no objection, and defendant denied making any such statements. Thereafter, on rebuttal, the prosecutor elicited testimony from two wartime acquaintances of defendant to the effect that he "got high" from stabbing and from watching people bleed to death.

Defendant now argues that the trial court erred in admitting the foregoing testimony because its probative value was outweighed by its prejudicial effect (see Evid. Code, § 352). The People, on the other hand, urge that the testimony was relevant to the issues of premeditation and deliberation. We need not decide, however, whether the trial court abused its discretion in admitting the testimony, because defense counsel failed to assert a proper objection thereto.

The record discloses that although defense counsel had some preliminary relevancy objections to *other* aspects of the proposed testimony of defendant's acquaintances, counsel nonetheless expressly informed the court that "I can appreciate the probative value in the fact that defendant told [witness] LaLonde that he liked to see people bleed to death."

Thereafter, when the prosecutor inquired of witness LaLonde regarding defendant's statement, defense counsel unsuccessfully objected on the grounds the question was leading and suggestive, but no further objection was made. Subsequently, when similar testimony was elicited from witness Austin, defense counsel made no objection whatever. Consequently, any objection based on the prejudicial effect of the LaLonde and Austin testimony was waived. (Evid. Code, § 353, subd. (a) [objection must state "specific ground"]; *People* v. *Castaneda* (1975) 52 Cal.App.3d 334, 339 [125 Cal.Rptr. 9].)

Defendant also contends that the foregoing testimony should not have been admitted for the purpose of determining the appropriate *penalty,* because defendant's statements were not relevant to any of the statutory factors listed in former section 190.3. Without passing on the merits of the contention, we again observe that defense counsel failed to rely upon this specific ground of objection to the admission of this evidence. At the commencement of the penalty phase, defense counsel and the prosecutor stipulated that, subject to the objections previously raised and rejected, the penalty jury may consider all the evidence previously admitted at the special circumstances trial. The testimony of witnesses LaLonde and Austin was not specifically mentioned, and defense counsel expressed no specific relevance objection to that testimony. Accordingly, that objection was waived.

PENALTY PHASE CONTENTIONS

1. *Witherspoon Error*

Defendant contends the trial court erred in excluding various prospective jurors on the basis of their attitudes concerning the death penalty. (Although several such jurors were excluded from the first special circumstances trial, we do not consider the propriety of their exclusion here as such exclusion could not have affected the *penalty* judgment.) According to defendant, these prospective jurors failed to make it unmistakably clear that they would automatically vote against the death penalty without regard to the evidence produced at trial. (See *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 522-523, fn. 21 [20 L.Ed.2d 776, 785, 88 S.Ct. 1770]; *Hovey* v. *Superior Court, supra,* 28 Cal.3d 1, 10-11.)

The review standard cited by defendant has recently been substantially modified by the United States Supreme Court in *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844]. As we observed in *People* v. *Allen* (1986) 42 Cal.3d 1222, 1275 [232 Cal.Rptr. 849, 729 P.2d 115], *Witt* adopted a new review standard, namely, "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' We note that, in addition to dispensing with *Witherspoon*'s reference to 'automatic' decisionmaking, this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.'" (469 U.S. at p. 424 [83 L.Ed.2d at pp. 851-852], quoting from Adams v. Texas (1980) 448 U.S. 38, 45 [65 L.Ed.2d 581, 589, 100 S.Ct. 2521].)

The high court observed in *Witt* that frequently voir dire examination does not result in an "unmistakably clear" response from a prospective juror, but nonetheless "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror." (469 U.S. at pp. 425-426 [83 L.Ed.2d at pp. 852-853].)

Because we think *Witt*'s review standard and underlying rationale make good sense, and because California courts have generally followed the teachings of the high court in determining when a prospective juror properly may be excused for cause because of his views regarding capital punishment, we adopt the *Witt* standard. As will appear, however, even under the more strict *Witherspoon* test, none of the prospective jurors was improperly excused for cause in the present case.

Our review of the record discloses that several prospective jurors made somewhat equivocal responses to voir dire inquiry but ultimately confirmed that they could not vote for death under any circumstances. As we recently explained, where equivocal or conflicting responses are elicited regarding a prospective juror's ability to impose the death penalty, the trial court's determination as to his true state of mind is binding on an appellate court. (*People* v. *Fields, supra,* 35 Cal.3d 329, 355-356; accord, *People* v. *Floyd* (1970) 1 Cal.3d 694, 725 [83 Cal.Rptr. 608, 464 P.2d 64]; see also *Wainwright* v. *Witt, supra,* 469 U.S. at pp. 428-430 [83 L.Ed.2d at pp. 854-856].)

In the present case, four prospective jurors (Villalobos, Cortese, DiMicelli and Peterson) gave equivocal answers which, if taken in isolation from the remainder of their voir dire examination, might be held insufficient to justify their exclusion under then applicable *Witherspoon* principles. (See *Fields, supra,* 35 Cal.3d at p. 355, and cases cited.) But at some point during the examination of these venirepersons, each of them demonstrated an inflexible inability to impose death. Propective juror Villalobos, for example, affirmed that "I could never vote for a man to be put to death. Couldn't do it." Juror Cortese was asked whether she would automatically exclude the death penalty in this case, and she replied "I think so at this time, yes," based upon her confessed inability to decide whether or not death was ever an appropriate penalty.

The record indicates that prospective juror Mrhre was excused on the proper alternative ground of hardship. In addition, the responses of two other challenged veniremen (Chasuk and Villalobos) indicated substantial doubt regarding their ability to render an impartial decision *of the special circumstances issue,* a proper ground for their exclusion wholly apart from their feelings regarding the penalty. (See *Hovey* v. *Superior Court, supra,* 28 Cal.3d 1, 11; *People* v. *Lanphear* (1980) 26 Cal.3d 814, 841 [163 Cal.Rptr. 601, 608 P.2d 689].) Juror Chasuk, for example, declared that the prospect of having to decide the penalty issue would "affect" his decision regarding the truth of the special circumstances allegation. Juror Villalobos agreed that she would have "difficulty" being impartial during the special circumstances phase, based upon the possibility that the death penalty might be imposed.

In a related argument, defendant suggests that each of the foregoing challenges for cause was improper because the trial court failed to inform the prospective jurors of their duty to subordinate their personal views regarding the death penalty and to obey the laws of this state. (See *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 514-515, fn. 7 [20 L.Ed.2d 776, 781].) But neither *Witherspoon* nor *Witt* requires this specific admonition and inquiry, or imposes a duty to inquire specifically into the person's ability to

follow the juror's oath and to set aside personal views. Implicit in a prospective juror's response disclosing an inability to vote for death is an unwillingness to subordinate his or her conscientious objections to the death penalty.

We conclude that none of the prospective jurors was improperly excused under the *Witherspoon* standard followed in this state at the time of trial. It follows, then, that none of them was improperly excluded under the new, less strict standard of *Wainwright* v. *Witt, supra,* 469 U.S. 412.

2. *Prosecutorial Misconduct*

a. *Voir Dire References to Commutation Power.* During voir dire at the second trial, the prosecutor made some references to the possibility that a person sentenced to life imprisonment without parole might nonetheless gain his freedom through pardon or commutation of sentence. (See *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430].) Although defendant now contends that the prosecutor's remarks were improper, no serious *Ramos* error occurred here.

In the present case, the prosecutor made two brief references at voir dire to the possibility of a future pardon or exercise of clemency. The first reference was made during his own interrogation of a prospective juror who had indicated that she would automatically vote for *death* rather than life imprisonment without parole if special circumstances were proven which would permit those penalties. The prosecutor inquired whether her view might change if her fellow jurors pointed out the possibility of habeas corpus, clemency or pardon. Her answer was unresponsive, defense counsel made no objection nor requested an admonition, and the matter was dropped.

The second reference occurred during the course of defense counsel's voir dire examination of a second prospective juror. Counsel had indicated that the choice of penalties was either death or "life imprisonment without possibility of parole [which] means that he will die in prison. One way or another, he will die in prison." The prosecutor interrupted, stating "Your Honor, that is not quite true," and explaining that "there is habeas corpus, clemency, pardon; there are all kinds of things. It doesn't mean he is going to die in prison. It means he can't be paroled." The defense counsel protested "That has nothing to do with that . . . ," and the trial court sustained the objection. The prosecutor made no further references to the pardon or clemency topic.

Although *Ramos* finds improper a jury instruction informing the penalty phase jury of the Governor's power to commute a sentence of life without

parole, nothing in that decision suggests a prosecutor's brief and isolated voir dire references to the subject would constitute reversible error, especially where defense counsel failed to seek an admonition which might clarify the matter. (See *People* v. *Green, supra,* 27 Cal.3d 1, 27.) We stressed in *Ramos* the fact that the so-called "Briggs instruction" was read to the jury after the penalty phase, when its attention was "narrowly focused" on the two alternative punishments awaiting its selection. (37 Cal.3d at p. 153.) Quoting from an earlier case, we observed that " '[r]eliability of the information considered [at the sentencing stage] is the key issue in determining fundamental fairness.' " (*Ibid.*)

By contrast, a prosecutor's offhand remarks made during voir dire, prior to the presentation of argument or evidence, obviously reach the jury panel at a much less critical phase of the proceedings, before its attention has even begun to focus upon the penalty issue confronting it. Under such circumstances, and in the absence of any evidence that the prosecutor was attempting to circumvent our *Ramos* rule (the voir dire in the present case long preceded that decision), we hold that any misconduct was, at most, harmless error. (Cf. *People* v. *Davenport, supra,* 41 Cal.3d 247, 287-288 [prosecutor's penalty phase argument].)

b. *References to Deterrent Effect of Death Penalty.* In his closing argument at the penalty phase, the prosecutor argued that, even though the deterrence theory is "full of holes," nonetheless if the death penalty deters just one person from murdering someone, "that is something you want to consider . . . ." Defendant claims the argument was improper.

In prior cases, we held that misconduct was committed by the prosecutor's argument that the death penalty was more effective as a deterrent than imprisonment. (See *People* v. *Purvis* (1963) 60 Cal.2d 323, 341-342 [33 Cal.Rptr. 104, 384 P.2d 424]; *People* v. *Ketchel* (1963) 59 Cal.2d 503, 537-539 [30 Cal.Rptr. 538, 381 P.2d 394]; *People* v. *Love* (1961) 56 Cal.2d 720, 729-730 [16 Cal.Rptr. 777, 366 P.2d 33].) In the present case, the prosecutor made no reference to the deterrent effect of imprisonment and, indeed, frankly acknowledged the weakness of the deterrence theory as applied to the death penalty. Although our prior cases indicate that the subject of the deterrent effect of the death penalty is a speculative subject best avoided in jury arguments, the prosecutor's brief reference to that topic in the present case was undoubtedly harmless and could not have affected the jury's verdict. Moreover, we observe that defense counsel failed to object to the argument or to seek an admonition or instruction on the subject. (*People* v. *Green, supra,* 27 Cal.3d 1, 27.)

c. *Prosecutor's Reference to Defendant's Lack of Remorse.* During his penalty phase argument, the prosecutor commented on the fact that defend-

ant "hasn't so much as told you he's sorry." Defendant contends that such argument was improper because it focused on his failure to confess and, accordingly, violated his privilege against self-incrimination. (See *Estelle* v. *Smith, supra,* 451 U.S. 454; *People* v. *Coleman* (1969) 71 Cal.2d 1159, 1168-1169 [80 Cal.Rptr. 920, 459 P.2d 248].)

Although prosecutorial comment regarding a defendant's silence may in some instances violate the privilege against self-incrimination (*Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]), here the prosecutor did not directly refer to defendant's failure to testify, for in fact defendant did testify in his defense, at least at the special circumstances trial. In any event, we have observed that brief and mild references to a defendant's failure to testify, unaccompanied by any suggestion that an inference of guilt should be drawn therefrom, are uniformly held to be harmless error. (*People* v. *Jackson, supra,* 28 Cal.3d 264, 305; *People* v. *Vargas* (1973) 9 Cal.3d 470, 478-481 [108 Cal.Rptr. 15, 509 P.2d 959].)

As for the prosecutor's reference to the subject of remorse, we have held that, under a prior death penalty law, the presence or absence of remorse is a factor relevant to the jury's penalty decision. (*People* v. *Coleman, supra,* 71 Cal.2d at p. 1168.) The concept of remorse for past offenses as a mitigating factor sometimes warranting less severe punishment or condemnation is universal. The prosecutor's argument here merely demonstrated the absence of that particular mitigating factor. (See *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 789-790 [230 Cal.Rptr. 667, 726 P.2d 113].) Finally, defense counsel failed to object to the prosecutor's remarks or to seek an appropriate admonition. (*People* v. *Green, supra,* 27 Cal.3d 1, 27.)

d. *Prosecutor's Appeal to Jury's Passion and Prejudice.* Defendant next asserts that the prosecutor committed misconduct by occasional references to "retribution" and "community outrage" against defendant for his offenses. Isolated, brief references to retribution or community vengeance such as occurred here, although potentially inflammatory, do not constitute misconduct so long as such arguments do not form the principal basis for advocating the imposition of the death penalty. (See *People* v. *Floyd, supra,* 1 Cal.3d 694, 722, and cases cited.)

The prosecutor made a brief reference to the impact of Mrs. Bert's death upon her family, a reference arguably inappropriate under the recent decision in *Booth* v. *Maryland* (1987) 482 U.S. __ [96 L.Ed.2d 440, 107 S.Ct. 2529] which bars admission of victims' impact statements at the penalty phase of capital cases. Although *Booth* is factually distinguishable, in any event an examination of the prosecutor's remarks leads us to conclude beyond a reasonable doubt that they had no effect on the verdict.

Thus, the prosecutor in closing argument merely observed that Mrs. Bert's death will "leave something precious missing from her family and her friends, her husband, for everyone. It's something that can never be replaced for a moment's pleasure on his part." Soon thereafter, the prosecutor asked the jury to "think about how you would feel if it were your baby, your daughter, your wife, your sister. It wouldn't be fair to have her family make this [penalty] decision. Rather it's better to have it removed from them and placed in your hands. But you have to consider them, you are the community of which they are a part. . . ."

The prosecutor's remarks were brief and mild, commenting upon the obvious loss resulting from Mrs. Bert's death. Unlike *Booth,* where the jury was given lengthy and specific details regarding the *actual impact* on the victim's family, here the prejudicial effect of the prosecutor's comments was undoubtedly minimal or nonexistent.

Defendant asserts that the prosecutor improperly stated his personal opinion regarding the appropriateness of the death penalty in this case. The record shows that the prosecutor, during the course of his closing argument, stated that "I don't hate him, but I know what the appropriate penalty is for what he did." We have held that it is improper for the prosecutor to state his personal belief regarding either defendant's guilt or the appropriateness of the death penalty, *based on facts not in evidence.* (*People* v. *Bandhauer* (1967) 66 Cal.2d 524, 529 [58 Cal.Rptr. 332, 426 P.2d 900].) In *Bandhauer,* the prosecutor emphasized that during his many years of practice he had seen some "pretty depraved characters" and that defendant was the worst. In contrast, in the present case, the prosecutor's remarks did not suggest that he possessed information, not formally in evidence, which would make death an appropriate remedy for defendant. The prosecutor's argument for the death penalty was based solely on the facts of record. Nonetheless, in future cases prosecutors should refrain from expressing personal views which might unduly inflame the jury against the defendant.

e. *Counsel's Incompetence.* Defense counsel failed to object to, or request an admonition regarding, many of the foregoing instances of misconduct. (See *People* v. *Green, supra,* 27 Cal.3d 1, 27.) Although defendant now asserts that such omissions disclosed incompetence on trial counsel's part, we previously have indicated that a mere failure to object to evidence or argument seldom establishes counsel's incompetence. (*People* v. *Jackson, supra,* 28 Cal.3d 264, 292; *People* v. *Frierson* (1979) 25 Cal.3d 142, 158 [158 Cal.Rptr. 281, 599 P.2d 587].) The foregoing instances of prosecutorial argument, either singly or in the aggregate, were not so damaging or prejudicial to defendant's case as to require a finding of incompetence.

Counsel may well have tactically assumed that an objection or request for admonition would simply draw closer attention to the prosecutor's isolated comments.

3. *Admission of Defendant's Other Crimes*

a. *Necessity of Empaneling Two Juries.* At the penalty phase of the trial, the prosecutor introduced evidence of certain prior offenses by defendant, including a prior rape, kidnap-assault and sexual assault. Defendant claims that he was denied his due process rights when the trial court allowed the same jury that convicted him "on the murder charge" to determine his guilt of these prior offenses for purposes of deciding the penalty issue. (See *State* v. *McCormick* (Ind. 1979) 397 N.E.2d 276.)

Of course, technically speaking, the jury hearing such evidence did not determine his guilt of murder, but was limited to the special circumstance and penalty issues. In any event, the point is without merit. (See *People* v. *Balderas, supra,* 41 Cal.3d at pp. 204-206 [rejecting similar contention under 1978 death penalty law].)

b. *Instructions on Elements of Other Crimes.* Defendant further contends that the trial court, sua sponte, should have instructed the penalty phase jury regarding the essential elements of defendant's uncharged criminal activity. Defendant acknowledges that the trial court properly instructed the jury that it must find beyond a reasonable doubt that an uncharged offense occurred before such offense may be considered in determining penalty. (*People* v. *Robertson* (1982) 33 Cal.3d 21, 53-55 [188 Cal.Rptr. 77, 655 P.2d 279].) But defendant suggests that the jury could not rationally determine whether the offenses were committed without first knowing their essential elements. (See, e.g., *Burger* v. *State* (1980) 245 Ga. 458 [265 S.E.2d 796]; *State* v. *Moore* (Tenn. 1981) 614 S.W.2d 348, 351.) In the absence of a prior request for such instructions, the contention is without merit. (See *People* v. *Davenport, supra,* 41 Cal.3d at pp. 281-282; *People* v. *Phillips, supra,* 41 Cal.3d 29, 72, fn. 25.)

c. *Instructions on Unanimity.* Defendant contends that the trial court erred in failing to instruct the jury, sua sponte, that its finding of uncharged criminal activity must be unanimous. The jury was instructed that "in order to make a determination as to the penalty, all twelve jurors must agree." That instruction is sufficient under existing law, and defendant cites no authorities which suggest that such unanimity must extend to each incident of uncharged criminal activity disclosed during the penalty phase. Any such requirement would immerse the jurors in lengthy and complicated discussions of matters wholly collateral to the penalty determination

which confronts them. Moreover, we see nothing improper in permitting each juror individually to decide whether uncharged criminal activity has been proven beyond a reasonable doubt and, if so, what weight that activity should be given in deciding the penalty.

d. *Dismissed Assault Charge*. Although the information charging such misconduct was dismissed, the People were permitted to introduce during the penalty phase evidence of a forcible sexual assault on witness Tyson. Defendant now contends that the trial court was "bound" by the dismissal and should have ruled the evidence inadmissible.

Former section 190.3 permitted the presentation of penalty phase evidence of "other criminal activity by the defendant which involved the use or attempted use of force or violence." Although proof of a conviction of the offense was unnecessary, no evidence could be admitted of a prior offense "for which the defendant *was prosecuted and acquitted*." (Former § 190.3, italics added.)

Defendant cites no controlling authorities favoring his position, and we conclude that his argument is without merit. A dismissal (§ 995) is not an acquittal after prosecution. Following such a dismissal, the People may refile the same charges (§ 1238), thus confirming that a dismissal is not a final determination of the matter. Moreover, permitting the People to rely upon evidence of a dismissed charge during the penalty phase is not unduly unfair to the defendant, for he is entitled to an instruction which requires that the jury find *beyond a reasonable doubt* that the offense was committed. (*People* v. *Robertson, supra,* 33 Cal.3d 21, 53-55.) Such an instruction was given here.

4. *Application of Special Circumstances Instruction to Penalty Phase*

The trial court, in addition to giving specific instructions governing the jury's penalty determination, also instructed the jury to consider any of the "previously given instructions which are pertinent to the determination . . . of penalty." Defendant argues that such an instruction was inadequate, failing to give proper guidance to the penalty jury regarding the legal principles applicable to its determination. In particular, defendant suggests that the jury might not have remembered certain instructions given during the special circumstances trial which bore on premeditation, deliberation and specific intent. According to defendant, these instructions might have assisted the jury in determining the existence of certain mitigating factors as to his state of mind, such as the presence of extreme mental or emotional disturbance (former § 190.3, subd. (c)), or mental disease, or intoxication (*id.*, subd. (g)).

Defendant fails, however, to convince us of the relevance of any of the special circumstances instructions to the penalty phase. By reason of its verdict finding such special circumstances, the jury necessarily found a willful, deliberate and premeditated murder, rejecting defendant's so-called "blackout" defense. The trial court reasonably could assume that reinstruction on such issues might only confuse the jury by injecting irrelevant factors into its penalty decision. In the absence of a specific request for such reinstruction, the trial court properly instructed the jury to apply any of the previous instructions that were relevant to the penalty issue. Such a general instruction would not prevent, of course, renewed instruction at the request of defendant or the jurors. No such request occurred here.

5. *Age as an Aggravating Factor*

One of the factors to be considered by the penalty jury "if relevant" is "the age of the defendant at the time of the crime." (Former § 190.3, subd. (h).) In the present case, the prosecutor argued to the jury that "He [defendant] is thirty. He is a man. He is not a 17, 18-year-old impulsive person . . . . His age is something that you have to consider; its another factor." Defendant failed to object to the prosecutor's argument or request an admonition to the jury. (See *People* v. *Green, supra,* 27 Cal.3d 1, 27.)

Defendant now contends that the prosecutor committed misconduct in arguing that defendant's age could be considered as an aggravating factor. According to defendant, age can only be a mitigating factor, and the trial court erred in failing to so instruct the jury. We recently stated that mere chronological age, a factor over which one can exercise no control, should not *of itself* be deemed an aggravating factor. (*People* v. *Rodriquez, supra,* 42 Cal.3d 730, 789.) On the other hand, the prosecutor is permitted to argue that the defendant, by reason of his maturity or sophistication is less deserving of mercy than a younger, and possibly less experienced, offender. (*Ibid.*) The prosecutor's remarks here reasonably may be viewed as merely arguing the inapplicability of a mitigating factor, rather than seeking to penalize defendant by reason of his age. No good reason appears for depriving the prosecutor of the opportunity to argue that certain otherwise mitigating factors are not present in the case. (*Id.,* at p. 790.)

We recently held that "in the future" prosecutors should refrain from arguing to the jury that the very absence of a mitigating factor would constitute an aggravating one to be weighed against the defendant. *People* v. *Davenport, supra,* 41 Cal.3d 247, 288-290; see also *People* v. *Allen, supra,* 42 Cal.3d 1222, 1283-1284; *People* v. *Rodriquez, supra,* 42 Cal.3d 730, 789.) The present case, however, was tried before *Davenport* was decided and, in any event, our review of the record convinces us that the prosecutor's

arguments regarding defendant's age and other inapplicable mitigating factors could not have affected the jury's verdict.

6. *Extreme Mental or Emotional Disturbance as a Mitigating Factor*

Former section 190.3, subdivision (c), asked the penalty jury to consider whether defendant acted under "extreme mental or emotional disturbance" during his commission of the offense. The jury was so instructed here. Defendant now asserts that the foregoing provision, by requiring an "extreme" condition, unduly limited the kinds of mitigating evidence admissible at the penalty phase. As defendant points out, prior cases have held that the trier of fact in a capital case must be permitted to give independent mitigating weight to any aspect of a defendant's character or background which is relevant to the penalty issue. (See *Lockett* v. *Ohio* (1978) 438 U.S. 586, 608 [57 L.Ed.2d 973, 992, 8 S.Ct. 2954].)

Another provision of the 1977 death penalty law, however, permitted consideration by the penalty jury of "*any* other circumstance which extenuates the gravity of the crime" (former § 190.3, subd. (j)), and we think that "catchall" provision is sufficient to permit the penalty jury to take into account a mental condition of the defendant which, though perhaps not deemed "extreme," nonetheless mitigates the seriousness of the offense. There is no basis in the record for concluding that the jury in the present case failed to give proper mitigating weight to defendant's evidence of his mental or emotional state at the time of the offense.

7. *Deletion of Nonapplicable Mitigating Factors*

As is apparently customary in capital cases, the trial court instructed the penalty phase jury by reading the entire statutory list of aggravating and mitigating factors (former § 190.3; see CALJIC No. 8.84.1) without deleting those factors which were assertedly inapplicable under the evidence. The instruction, however, was preceded by the admonition to consider these factors only "if applicable" to the case. Trial counsel made no objection to the foregoing instructions.

Defendant now contends that because certain mitigating factors were clearly inapplicable (e.g., the victim's participation in defendant's homicidal conduct [subd. (d)]; defendant's reasonable belief his conduct was morally justified [subd. (e)]), reference to these factors should have been deleted. He argues that such a reference may have served to confuse the jury by injecting irrelevant issues into its penalty determination.

The problem with defendant's analysis is that deletion of any potentially mitigating factors from the statutory list could substantially prejudice the

defendant. We believe that the jury is capable of deciding for itself which factors are "applicable" in a particular case. The present instruction is adequate for that purpose.

8. *Inadequate "Sympathy" Instructions*

Defendant contends that the jury was inadequately instructed regarding the aggravating and mitigating factors it might consider in determining penalty. Specifically, defendant complains of the trial court's failure to explain that evidence of mitigating factors related solely to defendant's background and character could be considered and used as a basis for a sentence less than death. Defendant contends that instructions based merely upon the "catchall" provision of the 1977 law ("any other circumstance which extenuates the gravity of the crime") are constitutionally inadequate. (See former § 190.3, subd. (j).)

We rejected a related claim under the 1978 death penalty law, holding that similar broad language in that law (see § 190.3, subd. (k)) permits the sentencer to consider all mitigating character and background evidence, and that the 1978 law is therefore constitutionally adequate in that regard. (*People* v. *Brown* (1985) 40 Cal.3d 512, 541 [230 Cal.Rptr. 834, 726 P.2d 516]; see *People* v. *Frierson, supra,* 25 Cal.3d 142, 178.) For the same reason the 1977 law is valid on its face.

A majority of the justices of the United States Supreme Court, upon reviewing our *Brown* decision, stressed the necessity of analyzing the record in each case to determine whether the jury instructions, taken as a whole, and read in conjunction with the prosecutor's arguments, adequately informed the jury of its responsibility to consider all of the mitigating evidence in the case. (See *California* v. *Brown* (1987) 479 U.S. 538, ___ [93 L.Ed.2d 934, 943, 107 S.Ct. 837, 842] (conc. opn. by O'Connor, J.), ___ [93 L.Ed.2d at p. 952, 107 S.Ct. at p. 850] (dis. opn. by Brennan, J.), ___ [93 L.Ed.2d at p. 953, 107 S.Ct. at p. 842] (dis. opn. by Blackmun, J.).) We have undertaken such a review, and we conclude that there exists "no legitimate basis" (see opn. of O'Connor, J., *id.,* at p. ___ [93 L.Ed.2d at p. 943, 107 S.Ct. at p. 842]) for believing that the jury was misled regarding its sentencing responsibilities.

Our review of the record indicates that the prosecutor made no remarks during jury argument which might have so misled the jury. The prosecutor originally outlined defendant's background and character evidence and argued that none of it extenuated the offense or "reduce[d] it down in way of mitigation, amelioration in extenuating circumstances." After defense counsel responded by commenting upon defendant's "good qualities" as ex-

pressed by his family, and shown by his commendable war record, the prosecutor acknowledged that the jury could "have mercy. Feel sorry for him. Give him all the benefit of sympathy you can conjure up for him."

The prosecutor concluded, of course, that the death penalty was nonetheless the appropriate penalty on weighing the various aggravating and mitigating factors. Defense counsel then gave his own concluding plea for the jury to exercise its discretion in favor of life imprisonment. In sum, the closing arguments presented the jury with a balanced mixture of explanation and advocacy. Nowhere did counsel misrepresent the scope of the jury's sentencing responsibilities. Moreover, in the present case we note that the trial court substantially modified the standard jury instructions in order to clarify the jury's sentencing responsibilities. First, the court explained that although the jury previously had been instructed (in connection with the special circumstances trial) not to be influenced by pity or sympathy for the defendant, "I instruct you that in this, the penalty phase, pity and sympathy for the Defendant *would be proper considerations* if you should find them to be warranted in these circumstances." (Italics added.) Moreover, in instructing the jury regarding the statutory mitigating factors, the court sua sponte partially clarified the "catchall" factor (§ 190.3, subd. (j)) to explain that "extenuates" means "tends to lessen" the gravity of the crime even though it is not a legal excuse therefor. We conclude that the jury could not have been misled regarding the scope of its penalty discretion.

9. *Constitutionality of 1977 Death Penalty Law*

Defendant contends that the 1977 law is unconstitutional in various other respects. Each of defendant's specific arguments was considered and rejected by us in recent opinions. (See *People* v. *Allen, supra,* 42 Cal.3d 1222, 1285-1288; *People* v. *Rodriquez, supra,* 42 Cal.3d 730, 777-779; *People* v. *Brown, supra,* 40 Cal.3d at pp. 538-545; *People* v. *Jackson, supra,* 28 Cal.3d at pp. 315-317; *People* v. *Frierson, supra,* 25 Cal.3d at pp. 172-188.)

10. *Validity of Death Penalty Under International Law*

Finally, defendant contends that the failure of the 1977 death penalty law to require that the trier of fact state in writing the reasons for imposing death violates "principles of international human rights law." Defendant acknowledges that we have rejected the argument that such written findings are required as a matter of domestic constitutional law. (See *People* v. *Jackson, supra,* 28 Cal.3d 264, 316-317; *People* v. *Frierson, supra,* 25 Cal.3d 142, 178-180.) Nevertheless, defendant relies upon various resolu-

tions of the United Nations General Assembly and Economic and Social Council to support his international law claim.

The foregoing resolutions invite or urge member states to ensure "the most careful legal procedures and the greatest possible safeguards" for the accused in a capital case. Defendant also observes that various international human rights declarations, charters and covenants recite that all persons have the "right to life."

As the People correctly point out, a treaty or international declaration or charter has no effect upon domestic law unless it either is implemented by Congress or is self-executing. (See *Hitai* v. *Immigration and Naturalization Service* (2d Cir. 1965) 343 F.2d 466, 468; *In re Alien Children Ed. Litigation* (D.Tex. 1980) 501 F.Supp. 544, 589-590, affd. *sub nom. Plyler* v. *Doe* (1982) 457 U.S. 202 [72 L.Ed.2d 786, 102 S.Ct. 2382]; See *Sei Fujii* v. *State of California* (1952) 38 Cal.2d 718, 721-725 [242 P.2d 617]; Rest.2d Foreign Relations Law, § 141, and com. at p. 432.)

Defendant cites no authorities suggesting that the international resolutions or other materials on which he relies have been held effective as domestic law. As stated in *Sei Fujii*: "The humane and enlightened objectives of the United Nations Charter are, of course, entitled to respectful consideration by the courts and legislatures of every member nation, since that document expresses the universal desire of thinking men for peace and for equality of rights and opportunities. The charter represents a moral commitment of foremost importance, and we must not permit the spirit of our pledge to be compromised or disparaged in either our domestic or foreign affairs. We are satisfied, however, that the charter provisions relied on by plaintiff were not intended to supersede existing domestic legislation . . . ." (38 Cal.2d at pp. 724-725.)

In any event, we have carefully examined the provisions cited by defendant and, as the concurring opinion of Justice Mosk aptly observes, none of them "compel[s] elimination of capital punishment."

### Motion to Augment Record

The judgment of death in this case was filed on October 30, 1979. Appellate counsel was appointed on March 24, 1980. The appeal was first argued on November 7, 1984, and then reargued on Monday, April 6, 1987. On April 3, the Friday preceding the reargument, appellate counsel filed an application to augment the record on appeal in numerous respects, including 23 days of pretrial proceedings evidently related to the severance issue

discussed above, a hearing on trial counsel's motion to withdraw, and a hearing on defendant's motion for new trial and modification of sentence.

The transcripts of the latter two hearings are part of the original appeal record, and have been considered by the court. As for the record of pretrial proceedings, counsel fails to indicate in what manner these transcripts would be useful to the appeal (see *People* v. *Silva* (1978) 20 Cal.3d 489, 492-493 [143 Cal.Rptr. 212, 573 P.2d 430]), or why he waited so long to seek augmentation. Accordingly, the motion to augment is denied.

The judgment of death is affirmed.

Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**MOSK, J.,** Concurring.—I agree with most of the opinion of the majority, but write separately to note some reservations.

The prosecutor argued to the jury that defendant's age could be considered an aggravating factor. In effect he strongly implied that a man 30 years of age should be held to a higher standard of conduct than a 17-year-old boy.

Despite some critical dictum by the majority in *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 788 [230 Cal.Rptr. 667, 726 P.2d 113], I am convinced that age is entirely neutral. It may be considered by the jury "if relevant" (former Pen. Code, § 190.3, subd. (h)). How it is to be evaluated may be argued by opposing counsel.

Thus the argument by the prosecutor in this case was perfectly proper. He was entitled to urge that the defendant's maturity be deemed an aggravating factor. Conversely, defense counsel could have insisted that the defendant's age reflected more potentially favorable qualities than might be evidenced by an impulsive youth and therefore should be deemed a mitigating factor.

In short, the advantages and disadvantages of age, young or old, cannot be rigidly categorized. They are entirely in the eye of the beholder.

I must also indicate reservations with the majority's somewhat cursory treatment of international treaties to which the United States is a signatory. From the earliest days of this republic, our international obligations have been considered part of controlling common law. Chief Justice John Marshall declared in 1815 that courts are "bound by the law of nations, which is part of the law of the land." (*The Nereide* (1815) 13 U.S. (9 Cranch) 388 [3

L.Ed. 769].) As recently as March 9, 1987, the United States Supreme Court discussed at length and relied on the United Nations Protocol Relating to the Status of Refugees in the case of *Immigration and Naturalization Service* v. *Cardozo-Fonseca* (1987) 480 U.S. __ [94 L.Ed.2d 434, 107 S.Ct. 1207]. The court held that the term "refugee" was to be "interpreted in conformance with the Protocol's definition."

The Second Circuit relied primarily on the Universal Declaration of Human Rights in its moving opinion in *Filartiga* v. *Pena-Irala* (1980) 630 F.2d 876. (Also see *Kenji Namba* v. *McCourt* (Ore. 1949) 204 P.2d 569; *Perez* v. *Sharp* (1948) 32 Cal.2d 711, 732 [198 P.2d 17] (conc. opn. of Carter, J.); *Pierburg GmbH & Co. KG* v. *Superior Court* (1982) 137 Cal.App.3d 238 [186 Cal.Rptr. 876]; *Volkswagenwerk Aktiengesellschaft* v. *Superior Court* (1973) 33 Cal.App.3d 503 [109 Cal.Rptr. 219]; *McMullen* v. *INS* (1981) 658 F.2d 1312.)

Nevertheless, I cannot agree with defendant that our international obligations, at least up to the present time, compel elimination of capital punishment. The International Covenant on Civil and Political Rights, signed by the United States and 71 other nations and effective since March 23, 1966, specifically recognizes the existence of the death penalty. Part III, article 6(2), of that treaty declares: "In countries which have not abolished the death penalty, sentence of death may be imposed only for the most serious crimes in accordance with the law in force at the time of the commission of the crime. . . ."

The several instructional errors committed by the trial court are troublesome, but I reluctantly conclude with the majority that they did not result in a miscarriage of justice. (Cal. Const., art. VI, § 13.)

**BROUSSARD, J.—**

I concur in the judgment, but write separately to address two related penalty phase issues.

I.

The prosecutor in his penalty phase argument reviewed the statutory factors, and properly pointed out that there was no evidence to support certain factors which, if present, would be mitigating. In the course of reviewing the evidence relating to the last factor (factor (j) of the 1977 law—any matter which extenuates the gravity of the crime) he stated that "[i]f you look at these factors every one of them aggravates the crime." He

thus argued that the absence of a mitigating factor constituted an aggravating factor.

That argument was erroneous. As we explained in *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 789 [230 Cal.Rptr. 667, 726 P.2d 113], "the purpose of 'aggravating' and 'mitigating' factors is to assess the seriousness of a capital crime in relation to others of the same general character. The mere absence of a mitigating element may weigh against a finding that the instant offense is less serious than 'normal,' and thus especially deserving of mercy, but it does not suggest that the crime is *more* serious than 'normal' and thus especially deserving of death." (See also *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861].) The fact that the present case was tried before *Rodriguez* and *Davenport* were filed is immaterial. We cannot affirm a death penalty if there exists a reasonable possibility that the prosecutor's erroneous argument, in combination with the court's instructions, affected the result. (See *People* v. *Allen* (1986) 42 Cal.3d 1222, 1281 [232 Cal.Rptr. 849, 729 P.2d 115]; *People* v. *Phillips* (1985) 41 Cal.3d 29, 83 [222 Cal.Rptr. 127, 711 P.2d 423].)

We have seen appeals in which the prosecutor put great emphasis upon the argument that absence of evidence of a mitigating factor rendered it aggravating. Prosecutors have even listed the factors on charts or blackboards, and tallied the score: nine to two in favor of aggravation, or whatever the count happened to be. Such tactics present a serious danger that the jurors will take into their deliberation a misleading impression that the case before them is not an ordinary murder (as horrible as such may be) but a particularly aggravated murder, one for which the statute especially prescribes the death penalty. That kind of misimpression is likely to affect the verdict. The danger is particularly great if the judge or prosecutor has given the jurors the incorrect impression that they have an absolute duty to return the death penalty if aggravating factors outweigh mitigating factors.

The present case, however, involves a far less serious error. We have only a single remark, unemphasized, in the course of the prosecutor's argument. This case was tried, moreover, under the 1977 law, and thus under jury instructions which explained that the statutory aggravating and mitigating factors function to guide, not to direct, the verdict. Under these circumstances, I agree with the majority that the error is not reversible.

## II.

Factor (c) in former section 190.3 asked the penalty jury to consider whether defendant committed the crime under "extreme mental or emotional disturbance." (The same language appears in factor (d) of the present

law.) The majority recognize that defendant is entitled to have the jury consider his mental or emotional disturbance as a mitigating factor, whether or not it qualifies as "extreme." They assert that the "catchall" provision (factor (j) of the 1977 law; factor (k) of the present law) is sufficient to permit the jury to consider such matters.

I agree that factors (j) and (k) as construed in our cases permit, indeed require, the jury to consider evidence of defendant's mental or emotional disturbance. (See *People* v. *Easley* (1983) 34 Cal.3d 858, 878 [196 Cal.Rptr. 309, 671 P.2d 813]; *People* v. *Frierson* (1979) 25 Cal.3d 142, 178 [158 Cal.Rptr. 281, 599 P.2d 587].) There remains, however, a danger that if the jury are simply instructed in the statutory language, they will believe the specific language of factors (c) or (d) controls the more general language of (j) or (k), and conclude that they should not consider evidence of nonextreme disturbance. Thus if the defense presents evidence of mental or emotional disturbance which might not qualify as extreme, the court should not give an instruction which could be misconstrued to bar consideration of that evidence.

Before we could reverse a death verdict because of the risk that the jury misconstrued factor (c), however, we would need some indication that the risk is a significant one. We might find such indication in arguments of counsel implying that nonextreme mental or emotional disturbance could not be considered, in rulings by the court to that effect, or in inquiries by the jury suggesting confusion or misunderstanding. No such indicia appear in the present record. I therefore would find no reasonable possibility that the instructions concerning factors (c) and (j) misled the jury.

Appellant's petition for a rehearing was denied October 1, 1987.