Filed 6/26/13  P. v. Bell CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C070170 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F02687) |
| v. | |
| LLOYD LEE BELL, III, | |
| Defendant and Appellant. | |

After hearing defendant's trial on a nine-count information encompassing several distinct incidents, a jury found him guilty of four counts of false imprisonment, two counts of being a felon in possession of a firearm, two counts of dissuading a witness, and assault with a deadly weapon.  The jury found true allegations that all the crimes were committed for the benefit of a criminal street gang and that defendant personally used a firearm in some of the offenses.  The trial court sentenced defendant to a determinate term of 40 years in state prison and an indeterminate term of 14 years to life.

On appeal, defendant contends there is insufficient evidence to support the second of his two convictions for dissuading a witness.  He argues the trial court erred in curtailing cross-examination of a key prosecution witness, and the People committed misconduct in closing argument.  He asks that his booking and classification fees be

1

stricken because the trial court did not explicitly find he had the ability to pay these fees. As we will explain, defendant's contentions fail to persuade. Accordingly, we shall affirm.

## FACTS

*March 13, 2011 Shooting*

Bobby Wilson lived with Maxine Johnson. On March 13, 2011, she left him at home with his friend "Little Bob" (Robert Solomon). When she returned in the evening, she saw defendant leaving. Solomon was upset, claiming his money had been taken. He and Wilson quickly left. Johnson entered the house and saw the mirror by the front door had been shattered. She called the police.

The police arrived and with Johnson's consent searched the house. They found a spent bullet casing on the floor inside the front door. There was a spent round in the closet nearby.

At trial, Wilson refused to answer questions about that day, claiming he did not recall the details. In a taped interview with a detective, which was played for the jury, Wilson said defendant shot at him.

The jury found defendant guilty of assault with a deadly weapon (Pen. Code,[1] § 245, subd. (b)), personal use of a firearm (§ 12022.5, subd. (a)(1)), and being a felon in possession of a firearm (§ 12021, subd. (a)(1)). The jury found both crimes were committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).) (Counts 8 and 9.)

---

[1] Further undesignated statutory references are to the Penal Code.

*March 15, 2011 Studio Incident*

Bakita Adame, who went by Pearl, worked at an entertainment center which had a recording studio.[2]  The studio was located in a strip mall where Adame's brother, Demetrius Muses, was trying to start a restaurant; another brother, Rick Muses, was living at the studio at the time.[3]

On March 15, 2011, at 6:00 p.m., defendant came to the studio with a number of others for a recording session.[4]  He had started a recording four or five days before.  The engineer tried to find defendant's recording, but was unsuccessful.  When Adame asked defendant the song's name, defendant became disrespectful and cursed at her.  Defendant said that if they could not find his song, he would "take over this motherfucker" and "take all the shit out of this motherfucker."  He threatened to "put a bullet in [her] fucking head."  He declared he and his companions were "4th Avenue Zillas" and they were "taking over shit"; he told Adame to "shut the fuck up" and referenced setting people on fire in lieu of discussion.  Defendant pulled a gun from the waistband of one of his companions and held it to Adame's head.[5]  Rick entered the studio, and defendant and two others rushed him.  Defendant told him to sit down before defendant "peeled his wig back."

---

[2]  As discussed further in Part II *post*, Adame had sustained a felony theft conviction.

[3]  Because the Muses brothers share the same surname, we refer to them by their respective first names.

[4]  Defendant was known as Skooter.  Two of defendant's companions, Charles Corbett and Troy Daniels, were also charged.  They each entered a plea to one count of false imprisonment with stipulated sentences of 8 and 13 years, respectively.  They are not involved in this appeal.

[5]  The jury failed to reach a unanimous verdict on the allegations of personal use of firearm.  The trial court declared a mistrial as to those allegations, which were subsequently dismissed.

At the beginning of defendant's outburst, Adame had called the studio's owner and told him there was a problem. The owner called Demetrius, who arranged for his fiancee to call the Sheriff's Department and then called Carey Bennett and asked him to check on Adame. Bennett went to the studio and gave his phone to Adame, telling her that her brother wanted to talk to her. Defendant grabbed the phone. Defendant told Bennett to sit down; he was in the wrong place at the wrong time. Bennett thought someone had a gun.

Jeremiah Ellis, who was performing community service at the studio, left to get snacks when defendant arrived. When he returned, defendant and another man came outside and told Ellis to go inside. They made Ellis sit down. Adame was on the couch, hysterical; defendant was telling her she had to pay him money every month.

One of defendant's group announced the police had arrived. Defendant told his captives that if anyone talked to the police he would "com[e] back to kill" them, so they had "better not say a fucking word." Defendant threatened a "blood bath." Several of defendant's group went to the back where the bathroom was.

The police entered the studio and asked for Adame. She looked sick and was using an oxygen tank to breathe. Adame said everything was fine. The police took her outside, where she repeatedly said there was no problem.

The police pat searched everyone and did a quick walk through, but did not find anything. Defendant was agitated; Adame wanted to speak and defendant told her to "shut her mouth."

Everyone stayed, including the police, while defendant and his group finished their recording and left. Rick then told the police that the men who had been recording had guns, threatened them, and held everyone hostage. Adame then also told the police what had happened.

The police recovered two loaded guns from the bathroom garbage can, a

4

nine-millimeter and a .45-caliber.  The cartridge found at Wilson's house came from the same nine-millimeter gun.  Neither defendant's fingerprints, nor his DNA, were found on either gun.

The jury found defendant guilty of four counts of false imprisonment (§ 236), being a felon in possession of a firearm (§ 12021, subd. (a)(1)), and dissuading a witness maliciously by force or a threat of violence (§ 136.1, subd. (c)(1)), all with gang enhancements (§ 186.22, subd. (b)(1)).  (Counts 1 through 6.)

*April 2, 2011 Possession of Firearms*

On April 2, 2011, Officer Andy Hall saw a white Chrysler parked behind an apartment on V Street.  The car was associated with a probationer he was looking for.  He knocked on the door of the apartment and the female who answered the door invited him in.  Defendant was sitting in a chair in the bedroom holding a phone; he appeared very nervous.  Hall found a loaded .38-caliber revolver in a jacket next to defendant.  Hall found another .38-caliber revolver in the hallway closet.

The jury found defendant guilty of being a felon in possession of a firearm (§ 12021, subd. (a)(1)), with a gang enhancement (§ 186.22, subd. (b)(1)).  (Count 9.)

*April 8, 2011 Threats*

On April 8, 2011, Demetrius and Bennett were moving things into the new restaurant near the studio.  Demetrius heard a commotion and saw defendant.  Defendant told Demetrius he looked like "that punk bitch Pearl," who had "been snitching around this motherfucker."  Demetrius responded that defendant "must be that asshole she's talking about that holding people up with guns inside there."  Demetrius told defendant his sister was not looking for problems.  Defendant said it was too late because she was "snitching," and he told Demetrius he could not open his restaurant unless he paid defendant every week.  Defendant brandished his weapon by lifting his shirt so Demetrius saw the gun handle.  Then defendant saw Bennett and accused him of

"snitching" too. Defendant told Demetrius, "your sister's dead. When I find that bitch, she's dead."

Demetrius did not open the new restaurant. He feared for his safety and the safety of his family.

The jury found defendant guilty of knowingly and maliciously dissuading a witness with force or threats (§ 136.1, subd. (c)(1)) and found the personal use of a firearm (§ 12022.5, subd. (a)(1)) and gang (§ 186.22, subd. (b)(4)) enhancements true. (Count 7.)

*Gang Evidence*

A gang detective testified that Ridezilla or Underworld Zilla was a subset of the Oak Park Bloods criminal street gang. It was one of the few gangs that operated both in prison and on the street. Ridezilla began as a rap group. The detective opined that defendant was an active member of the Oak Park Bloods or Ridezilla. His opinion was based on numerous contacts, gang clothing, defendant's admission, gang crimes, and activity. In response to a hypothetical based on the facts of this case, the detective opined that defendant's crimes benefitted the gang.

*Defense*

Defendant's wife testified that defendant did not live with her at the apartment on V Street (where law enforcement had found defendant with guns). The male clothing belonged to her boyfriend, not defendant. The guns were hers (although she could not describe the gun found in the jacket).

Defendant denied he shot at Wilson or threatened Adame at the studio or had a gun that day. He claimed he did not live on V Street and the guns at the apartment were not his. When he saw Demetrius in the parking lot, defendant only asked him to have Adame call him; he made no threats.

## DISCUSSION

### I

*Sufficient Evidence of Count 7 - Dissuading a Witness*

Defendant first contends insufficient evidence supports his conviction on count 7, dissuading witnesses Adame and Demetrius on April 8. Defendant concedes that the evidence shows "he certainly did something wrong," but argues his actions and words did not constitute a violation of section 136.1.

The information charged defendant in count 7 with a violation of section 136.1, subdivision (c)(1), with both Adame and Demetrius named as victims. The elements of a violation of section 136.1, subdivisions (a)(1) and (c)(1), are that (1) the person threatened is a witness to a crime; (2) the person charged, with the specific intent to do so, attempted to prevent or dissuade the witness from attending or giving testimony at any trial, proceeding, or inquiry authorized by law; (3) the person charged acted knowingly and maliciously; and (4) the act of preventing, dissuading or the attempt thereto, was accompanied by force or by an express or implied threat of force or violence upon the person or property of the witness or any third person. (§ 136.1, subds. (a)(1) & (c)(1); see also CALCRIM Nos. 2622, 2633.)[6]

---

[6] Section 136.1 in pertinent part provides as follows: "(a) Except as provided in subdivision (c), any person who does any of the following is guilty of a public offense and shall be punished by imprisonment in a county jail for not more than one year or in the state prison: [¶] (1) Knowingly and maliciously prevents or dissuades any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law. [¶] (2) Knowingly and maliciously attempts to prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law. [¶] . . . [¶] (c) Every person doing any of the acts described in subdivision (a) or (b) knowingly and maliciously under any one or more of the following circumstances, is guilty of a felony punishable by imprisonment in the state prison for two, three, or four years under any of the following circumstances: [¶] (1) Where the act is accompanied by force or by an express or implied threat of force or violence, upon a witness or victim or any third person or the property of any victim, witness, or any third person. [¶] . . . [¶] (d) Every person attempting the commission of

7

Defendant contends there is no evidence he was preventing or dissuading either witness from testifying, although he admits threatening Adame. We are not persuaded. Defendant's interaction with Demetrius in the parking lot was focused on defendant's extreme displeasure with "snitching." Defendant's threat to kill Adame demonstrated defendant's intent to retaliate for her past act of reporting his crimes to the police, and the jury could also interpret the threat as a warning not to testify in the future. (*People v. Ford* (1983) 145 Cal.App.3d 985, 989.) Defendant threatened to kill Adame when he found her; certainly he would "find" Adame at trial if she testified. The fact that defendant's comments only *directly* referred to Adame's past "snitching" does not immunize him from guilt for attempting to dissuade her from giving testimony in the future. (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1344.) Further, the jury could also reasonably construe defendant's threat as a warning to Demetrius not to testify against defendant or he too would face violence.

"There is, of course, no talismanic requirement that a defendant must say 'Don't testify' or words tantamount thereto, in order to commit the charged offenses. As long as his words or actions support the inference that he . . . attempted by threat of force to induce a person to withhold testimony [citation], a defendant is properly" convicted of a violation of section 136.1, subdivision (c)(1). (*People v. Thomas* (1978) 83 Cal.App.3d 511, 514 [in hallway outside courtroom defendant cursed at and threatened witness and yelled, "You put my mother in jail, you had my mother picked up"].)

Substantial evidence supports defendant's conviction on count 7.

---

any act described in subdivisions (a), (b), and (c) is guilty of the offense attempted without regard to success or failure of the attempt. The fact that no person was injured physically, or in fact intimidated, shall be no defense against any prosecution under this section."

## II

### Restricted Cross-Examination of Adame

Defendant contends the trial court abused its discretion in limiting cross-examination of Adame. He argues that because he was not allowed to ask Adame about the details of her fraud conviction, his Sixth Amendment right to confront witnesses against him was violated.

*A.    Background*

Before trial, the court ruled defendant could impeach Adame with her felony grand theft and identity theft convictions. The defense indicated its intent to call as witnesses a former IHSS (In-Home Supportive Services) worker who had been deceived by Adame, and also Stacy Hutchins, the victim of the identity theft, as well as to introduce certain documents. The court said it would not permit collateral witnesses to relitigate the theft case because Adame had entered a plea. It was, however, "fair game" for the defense to question Adame about the benefit she received in the plea bargain. Subsequently, the court asked counsel if there were issues regarding impeachment that needed to be addressed. Defense counsel responded, "I think we have already talked about our stuff."

On direct examination, Adame testified she had suffered a 1991 misdemeanor conviction for welfare fraud and more recently was involved in a felony theft case. That case involved allegations that she was over-billing for in-home care services, that she received money for services she did not provide. She pled no contest to the felony charges and was granted probation. Regarding the instant case, the District Attorney's Office had arranged that she move from her previous residence and had also provided her with financial assistance, about $1,700 over five months, plus relocation costs, presumably given the danger of retaliation for her testifying.

On cross-examination, Adame testified she had also received money for vehicle repairs, although she claimed not to know the specific amounts. Adame admitted she

9

pled guilty to using Hutchins's signature to sign checks that were not hers. She spent no time in custody. The bail amount was $45,000, but she was released on her own recognizance. The People put her matter on calendar to modify her formal probation to informal probation.

When the defense tried to question Adame about additional details of her conviction, the court sustained the People's Evidence Code section 352 objections. The defense did question Adame about over-billing in the amount of $44,000 over almost three years; Adame responded it ended when she found Hutchins in bed with her husband. Adame denied she wrote 70 checks without Hutchins's permission, claiming Hutchins signed some. When the defense pursued this issue, the court sustained an objection. The court also sustained objections when the defense asked if Adame had used Hutchins's social security number. The court told counsel to move on to another area. "Counsel, we have already, I think, covered this area sufficiently. It's getting to the point where minutia is not relevant in light of the time consumption. So, move on."

Later, defendant put on the record the tactical decision not to call Hutchins as a witness because the court had ruled her testimony would be limited to her opinion of Adame's character for honesty. The court reiterated its position that specific instances of misconduct are potentially admissible if they relate directly to honesty and veracity and the court had permitted limited cross-examination as to the underlying facts of Adame's conviction. The court would not, however, permit relitigation of something already resolved by criminal adjudication.

B.     The Law

The Sixth Amendment's confrontation clause guarantees an accused in a criminal prosecution the right to be confronted with the witnesses against him. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678 [89 L.Ed.2d 674, 682-683 ] (*Van Arsdall*).) The essential purpose of this right is "'to secure for the opponent the opportunity of cross-examination.' [Citation.]" (*Davis v. Alaska* (1974) 415 U.S. 308, 315-316 [39 L.Ed.2d

347, 353] (*Davis*).) An important function of the right of cross-examination is exposure of a witness's motivation in testifying. (*Van Arsdall, supra*, 475 U.S. at pp. 678-679 [89 L.Ed.2d at p. 683].)

Trial judges retain wide latitude to impose reasonable limits on cross-examination to avoid harassment, prejudice, confusion of the issues, danger to the witness's safety, or interrogation that is repetitive or only marginally relevant. (*Van Arsdall, supra*, 475 U.S. at p. 679 [89 L.Ed.2d at p. 683].) "In particular, notwithstanding the confrontation clause, a trial court may restrict cross-examination of an adverse witness on the grounds stated in Evidence Code section 352. [Citation.]" (*People v. Quartermain* (1997) 16 Cal.4th 600, 623 (*Quartermain*).)

The standard for whether a trial court abused its discretion in restricting defense cross-examination of a prosecution witness is whether a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted. (*Van Arsdall, supra*, 475 U.S. at p. 680 [89 L.Ed.2d at p. 684]; *Quartermain, supra,* 16 Cal.4th at pp. 623-624.)

"Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

C.    *Analysis*

Defendant contends the details of Adame's crime would support the defense theory that she fabricated the events at the studio. He claims that due to the restriction on cross-examination, Adame was "bathed in artificial credibility." We disagree.

11

Defendant relies on *Davis, supra,* 415 U.S. 308 [39 L.Ed.2d at p. 353]. In *Davis,* the sole witness to the petitioner defendant's involvement in the theft of a safe from a bar was, at the time of trial, as well as at the time of the events to which he testified, on juvenile probation after having been adjudicated a delinquent for burglarizing two cabins. Defense counsel sought to impeach the witness with his juvenile adjudication, arguing that he not only might have made a hasty and faulty identification of petitioner to shift suspicion away from himself as one who robbed the bar, but might also have been subject to undue pressure from the police and made his identifications under fear of possible probation revocation. (*Davis, supra,* 415 U.S. at p. 311 [39 L.Ed.2d at p. 351].)

The United States Supreme Court held that the refusal to allow cross-examination about the witness's probationary status denied the defendant his constitutional right to confront witnesses against him. (*Davis, supra*, 415 U.S. at p. 318 [39 L.Ed.2d at p. 355].)

*Davis* is readily distinguishable from the case at hand. Here, defendant was only slightly limited in exercising his right to cross-examine Adame about her prior conviction or the benefits she received from the People. The defense was able to show that Adame had been involved in a serious theft of $44,000 over a three-year period. In addition to a generous plea bargain permitting probation, Adame obtained modification of her probation from formal to informal, was relocated at the People's expense, and received other financial aid. Thus, defendant was able to attack Adame's credibility by showing that she was a thief and that she had received considerable benefits from the prosecution.[7]

Defendant contends limiting the cross-examination of Adame was an abuse of discretion because he had "persuasive evidence" that she fabricated her story and he needed to explore the details of her crime to undermine her credibility. He cites Adame's claim that she was hysterical during the ordeal, but the responding officer noted no such

---

[7] Her evasive answers to questions about her crime also served to undercut her credibility.

distress, and the lack of forensic evidence tying the guns to defendant.[8] The record does not show strong evidence of fabrication. While defendant refers to Adame as the key prosecution witness, she was not the sole witness as to the crimes at the recording studio. Adame's version of events at the studio was corroborated not only by the testimony of Bennett, Ellis, and Rick, but also by their statements to the police at the scene, before there was an opportunity to conspire against defendant. The testimony of Demetrius and Bennett about defendant's threats a few weeks later in the parking lot also provided corroboration.

Defendant fails to show how the details of Adame's crime would have bolstered his contention that she fabricated her story about hostage taking at the studio. He offers nothing that would show Adame had a motive to frame defendant. He fails to show the jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted. (*Van Arsdall, supra*, 475 U.S. at p. 680 [89 L.Ed.2d at p. 684]; *Quartermain, supra,* 16 Cal.4th at pp. 623-624.)

"'While cross-examination to test the credibility of a prosecution witness is to be given wide latitude, its control is within the discretion of the trial court, and the trial court's exclusion of collateral matter offered for impeachment purposes has been consistently upheld.'" (*People v. Redmond* (1981) 29 Cal.3d 904, 913; see *Quartermain, supra*, 16 Cal.4th at p. 625 [trial court did not abuse discretion by excluding impeachment on collateral matter].) Defendant has not shown an abuse of discretion in limiting the cross-examination of Adame.

---

[8] There was, however, evidence tying one of the guns found at the recording studio to the shooting at Wilson's house.

### III

### *Prosecutorial Misconduct*

Defendant contends the People committed repeated misconduct in closing argument. He contends three comments by the prosecutor, to which the trial court sustained defendant's objection, improperly asked the jury to "send a message" about stopping gang violence.

*A.*      *Background*

To explain why Adame was relocated and why Wilson was reluctant to identify defendant as the shooter, the prosecutor discussed Oak Park gangs and their use of violence and intimidation. The following occurred.

[Prosecutor]: "And the reality is this: The gang detectives I work with, my office, we can't take that power back from Skooter.

[Defense Counsel]: "Objection, Your Honor.

[The Court]: "Sustained.

[Prosecutor]: "We can't do anything.

[Defense Counsel]: "Objection, Your Honor.

[The Court]: "Sustained.

[Prosecutor]: "In reality, the only people who have the power to stop gang violence in any community in the system of justice that we have designed is you.

[Defense Counsel]: "Objection, Your Honor.

[The Court]: "Sustained.

[Prosecutor]: "Here's the deal: The Skooter's of the world in cases like this take over businesses, they take over communities, and they have to stand trial. And that's what we have here, and that's why I am asking you to make tough decisions in a case like this."

There was no further objection and the prosecutor turned to discussing the elements of the gang enhancement.

14

*B.     The Law*

"To constitute a violation under the federal Constitution, prosecutorial misconduct must 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.' [Citations.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 122.) "A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202 (*Cole*).) "When the issue 'focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citations.]" (*Cole, supra,* 33 Cal.4th at pp. 1202-1203.)

"'It is, of course, improper to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." [Citation.]'" (*People v. Redd* (2010) 48 Cal.4th 691, 742.) "It has long been settled that appeals to the sympathy or passions of the jury are inappropriate at the guilt phase of a criminal trial." (*People v. Fields* (1983) 35 Cal.3d 329, 362.)

"A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1251.) On the other hand, a prosecutor may not urge the jury to convict defendant for reasons unrelated to the evidence presented at trial. (See e.g., *United States v. Solivan* (6th Cir.1991) 937 F.2d 1146, 1155 [prosecutor committed misconduct by asking the jury to send a message to defendant and all other drug dealers that "we don't want that stuff in Northern Kentucky"].)

15

Finally, "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion--and on the same ground--the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

C.      Analysis

Defendant forfeited his claim of prosecutorial misconduct by failing to request a curative admonition. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275 (*Gonzales*).) Defendant contends an admonition would have been futile because the jury could not "forget" what it just heard. We find it more probable that the failure to seek an admonition was "a reasonable strategic decision" due to the minimal "rhetorical impact" of these comments. (*Gonzales, supra,* 54 Cal.4th at p. 1275.)

In any event, we find the prosecutor's comments were not prejudicial misconduct. "Isolated, brief references to retribution or community vengeance . . . , although potentially inflammatory, do not constitute misconduct so long as such arguments do not form the principal basis for advocating the imposition of the death penalty. [Citation.]" (*People v. Ghent* (1987) 43 Cal.3d 739, 771.) Here, the prosecutor did not argue for retribution or vengeance; instead, he focused on the jury's role in the criminal justice system. He told the jury it was their job alone to determine defendant's guilt and, by finding defendant guilty, they could help stop gang violence.

Similar arguments have been found not to constitute misconduct. In *People v. Lang* (1989) 49 Cal.3d 991, 1041, the prosecutor told the jury, "if you want to have a voice in your community and an effect upon the law in the community, this is your opportunity." Our Supreme Court found "[n]o reasonable juror would have construed the remarks as urging the jurors to follow community sentiment rather than their own judgment." (*Ibid*.) In *People v. Wash* (1993) 6 Cal.4th 215, 261–262, the court found no misconduct where prosecutor urged "jury 'to make a statement,' to do 'the right thing,' and to restore 'confidence' in the criminal justice system by returning a verdict of death."

Here, the prosecutor did not invite the jury to convict defendant solely because of his gang status and no reasonable juror would have so construed his remarks. Instead, the closing argument focused the reasons Adame was credible and the corroborating evidence. There was no prejudicial prosecutorial misconduct.

IV

*Ability to Pay Booking Fee*

The trial court imposed a $289.78 booking fee and $53.23 classification fee pursuant to Government Code section 29550.2, without objection from defendant. Defendant now contends that the trial court erred in imposing these fees because it failed to make a finding as to defendant's ability to pay and did not determine the actual administrative costs involved. The People respond that defendant has forfeited this claim by his failure to object to the imposition of the fees in the trial court.

Our Supreme Court recently adopted the People's position in *People v. McCullough* (2013) 56 Cal.4th 589 (*McCullough*). There, the defendant challenged the imposition of a booking fee without a finding of the ability to pay. The high court held, "a defendant who does nothing to put at issue the propriety of imposition of a booking fee forfeits the right to challenge the sufficiency of the evidence to support imposition of the booking fee on appeal, in the same way that a defendant who goes to trial forfeits his challenge to the propriety of venue by not timely challenging it." (*Id*. at p. 866.) The court noted that, "the Legislature considers the financial burden of the booking fee to be de minimis and has interposed no procedural safeguards or guidelines for its imposition. In this context, the rationale for forfeiture is particularly strong. [Citation.]" (*Id*. at p. 867.) The court further noted that determining a defendant's ability to pay was "much less complex" than determining his sentence. (*Ibid*.) "Given that imposition of a fee is of much less moment than imposition of sentence, and that the goals advanced by judicial forfeiture apply equally here, we see no reason to conclude that the rule permitting challenges made to the sufficiency of the evidence to support a judgment for the first time

17

on appeal 'should apply to a finding of' ability to pay a booking fee under Government Code section 29550.2.  [Citation.]"  (*Ibid*.)

The reasoning of *McCullough* applies equally to the classification fee. Defendant's contentions regarding both the booking fee and classification fee are forfeited by his failure to object below.

## DISPOSITION

The judgment is affirmed.


                                                                         DUARTE_____, J.


We concur:


_____BLEASE_____, Acting P. J.


_____ROBIE_____, J.