Filed 12/9/25  P. v. Mills CA5

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JAMES DEWEY MILLS,<br><br>Defendant and Appellant. | F087855<br><br>(Super. Ct. No. VCF417346)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Melinda Myrle Reed, Judge.

Tonja R. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill, Kari Ricci Mueller and Viktoriya Chebotarev, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

In an information filed on October 19, 2022, the Tulare County District Attorney charged defendant with 14 counts of performing a lewd act with a child. (Pen. Code, § 288, subd. (a).)[1] As to counts 1 through 9,[2] the information alleged defendant engaged in substantial sexual conduct with the victim, who was under the age of 14. (§ 1203.066, subd. (a)(8).) As to all counts, the information also alleged defendant was a habitual offender under section 667.71 because he had been previously convicted of violating section 288 on April 1, 1999. The information also alleged this prior conviction qualified as a strike and a prior serious felony. (§§ 667, subds. (a)(1) & (d), 1170.12, subd. (b).)

Defendant admitted he had a prior conviction that violated section 667.71, and that the prior conviction was a strike and a serious felony. Defendant also admitted the substantial sexual conduct allegation.

A jury convicted defendant as charged on counts 1, 4, 5, 7, 8, 9, 10, 11, 12, 13, and 14. On count 2, the jury acquitted on the charged offense but convicted on the lesser included offense of attempted lewd act upon a child. The jury acquitted defendant on counts 3 and 6, as well as on the lesser included offense of those counts (i.e., attempted lewd act upon a child).

At sentencing, the trial court struck the punishment for the five-year enhancement under section 667, subdivision (a)(1). The court imposed consecutive 50-year-to-life terms on each of counts 1, 4, 5, 7, 8, 9, 10, and 11; a consecutive term of 25 years to life on count 2; and consecutive terms of five years to life on each of counts 12, 13, and 14.

---

[1]    All further code references are to the Penal Code.

[2]    Both parties agree this allegation pertained to counts 1 through 9. And it is true that the section 1203.066 allegation is included under the headings for each of those counts, including count 9. However, the actual text of the allegation reads: "It is further alleged pursuant to … section 1203.066[, subdivision] (a)(8) as to *count(s) 1–8* that the victim, M.J., in the above offense was under the age of 14 years and the defendant(s) JAMES DEWEY MILLS, SR. had substantial sexual conduct with M.J." (Italics added)

2.

The total term imposed by the court was 575 years to life. The court also imposed several fines and fees, and required that defendant register as a sex offender for life.

## FACTS

Defendant's niece Savannah testified at trial. Savannah had five children, including her daughter M.J. who was born in April 2007. When M.J. was 11 to 14 years old, Savannah lived with her children and her mother in Tulare.

According to Savannah, defendant would sometimes come over to ask if M.J. wanted to earn money doing dishes or cleaning his house. The first time M.J. went to defendant's house, she was almost 12 years old. M.J. went to defendant's house to do housework "[a]t least a dozen times."

M.J. testified somewhat differently as to these events. M.J. did not go to defendant's house to clean and she did not remember him paying her. She did recall moving around pottery at defendant's house. When asked about her interactions with defendant, M.J. testified Savannah would call defendant and say she "needed a break" from M.J. Defendant would come pick up M.J. and bring her to his house. This occurred around six times. Usually, defendant would come alone to pick up M.J. but on rare occasions defendant's wife would accompany him.

In July 2021, M.J. told Savannah that something sexual had happened between her and defendant. Savannah later observed a scar between M.J.'s vagina and rectum while she was changing. Savannah told a responding police officer that M.J. had said defendant had intercourse with her only one time. However, Savannah testified she did not know everything that had happened between M.J. and defendant at the time she initially spoke with police officers.

M.J. testified that on the way to defendant's house one day, he took her to an orchard in his Ford Expedition. Defendant told her to get in the back seat and lay down. Defendant then got on top of her and pulled down her pants. He also pulled down his own pants, and put his penis "inside" of her vagina. Defendant had sex with her, and his

3.

body moved "up and down." The intercourse hurt and M.J. was trying not to cry. Afterwards, M.J. said she wanted to go home, and defendant took her home. Defendant told M.J. not to tell her mother, which made M.J. scared. M.J. testified defendant only had intercourse with her this one time.

One time, at M.J.'s house, defendant grasped her breasts over her clothes with his hands. Eventually, she pushed defendant off of her.

On another occasion while M.J. was at defendant's house, he had her go to the garage. Defendant told M.J. they were "going to do something" and unfastened his belt. M.J. understood defendant was trying to have sex with her. M.J. tried to push him off, but defendant was "mean" to her and yelled at her.

On another occasion, defendant made M.J. "suck his male part" while in his vehicle.

Defendant once told M.J. to "give him a hand job." Specifically, defendant made her put her hand on "it" and move her hand.

On another occasion, defendant, M.J., M.J.'s brothers, and defendant's wife went to a lake. While M.J. stood in the water, defendant "fingered" her vagina. In total, defendant put his fingers in M.J.'s vagina on three separate occasions over two years.

Months before M.J.'s disclosure to Savannah, M.J. had gotten in trouble for "messaging … older teenage boys and men on SnapChat, and they were exchanging pictures." Savannah gave M.J.'s phone to the police.

Before M.J. turned 12, she loved being around family and friends, but now she is afraid to be alone with her brothers and her other uncles. Savannah needs to be with M.J. "24/7" when she is not in school.

*M.J.'s Forensic Interview*

Officer Robert Vasquez was dispatched in response to Savannah's report of M.J.'s sexual abuse on the afternoon of July 16, 2021. Vasquez obtained an initial statement from Savannah and then referred the matter to detectives. He did not speak with M.J.

4.

because he knew she would have to talk to detectives later anyway and, given her age, did not want her to have to describe the abuse twice.

A Child Abuse Response Team (CART) interview was held on August 20, 2021. The interview was recorded and transcribed.[3]

M.J. told the interviewer that she was "assaulted" by her "grandma's brother," James. He "touched" her "front" with his hands and his "middle." By "middle," M.J. meant the thing used to "make babies." These incidents occurred after she turned 12 and occurred on more than one occasion.

On one occasion, defendant touched and pinched her breasts over her clothing while they were at a lake. M.J. was changing clothes in a vehicle when defendant came inside, and touched the outside of her "middle."

A couple months later, defendant was driving M.J. to his house when he put his hands in her underwear. M.J. felt that defendant's fingers "went inside," and it hurt.[4] Defendant asked, " 'Did it feel good?' " M.J. replied, "No." Defendant said, " 'You are lying.' " M.J. tried to get out of the vehicle, but defendant locked the doors and would not let her out.

Defendant then stopped at an orchard near his house. Defendant pulled up M.J. clothes and "suck[ed]" her breasts. M.J. tried to push him off but he was too heavy. Defendant made M.J "give him a hand job," and started "putting his middle part inside of me." M.J. told him to stop or she would tell someone. Defendant told her, " 'You better not tell, or I will do something to you,' " in a scary voice. Defendant brought M.J. to his house, pushed her against a wall in the garage, pinched her breasts, and put his "middle thing" on M.J. over her clothes. M.J. believed defendant's wife knew something

---

[3]     While the trial court told the jury that the "actual evidence" was the recording of the interview, and the transcript was "just an aid," both parties cite directly to the transcript rather than the recording. We will do the same.

[4]     Defendant touched her "middle" in this fashion on three different days.

5.

was happening and did not care because someone was watching through a window. M.J. told defendant she needed to go to the bathroom, so he stopped. M.J. was 13 years old when this occurred.

On another occasion, defendant came to her house and went into M.J.'s room. Savannah then left the room, and when M.J. tried to go with her defendant pulled her back. M.J. pushed defendant and was able to get free and go to Savannah.

About six months prior to the CART interview was the last time defendant touched M.J. He again took her to the orchard and made her give him "hand jobs." Defendant pulled down M.J.'s pants, and put his "thing" inside of her.

A few months after the last incident, after M.J. had turned 14, she went to the doctor because she was feeling sick, her body hurt, and she had "bumps" on her "middle part." According to M.J., the doctor told her she had HPV. Savannah asked M.J. how she got it, and M.J. "told her everything."

In total, according to M.J.'s forensic interview defendant made M.J. give him hand jobs on three occasions; he put his "middle" in her "middle" three or four times; he touched the outside of her "middle" four times and the inside of her "middle" twice; he put his mouth on her breasts two times and touched her breasts three times. M.J. denied that defendant ever made her put her mouth on his body.

*Further Investigation*

On September 1, 2021, M.J. and Savannah came to the police department so Corporal Jose Esparza could have M.J. review a booking photo of defendant. Esparza presented the photograph to M.J. face down. When M.J. turned the photograph over, she "threw it back and began crying."

On September 7, 2021, Esparza had a telephone conversation with defendant. Esparza said he needed to speak with defendant about his sex offender registration status. In fact, this was a ruse so that he could take defendant into custody at the police station. Defendant came to the police station the same day and Esparza arrested him.

6.

*Defendant's Interrogation*

Esparza *Mirandized*[5] defendant and then interrogated him.[6] When asked how old M.J. was, defendant said, "Twelve, I think." Defendant acknowledged he brought M.J. to his house a couple times to pay her to wipe down the many ceramics he has. Most of the time, it would just be defendant and M.J. in his vehicle as they went to his house. Defendant said his wife was present at the house when M.J. came over.

Defendant was aware that for the last two or three months, M.J.'s mother and grandmother had been saying he was "messing with" M.J. sexually. Defendant said he knew that was not true because he is impotent and cannot get an erection. Defendant also claimed he did not get along well with M.J. because she is standoffish.

Defendant said his sister and niece would tell him that M.J. would send naked photographs of herself to "guys." As a result, defendant stopped going to M.J.'s house. Defendant claimed he had last seen M.J. six months ago.

Defendant said he did not know why M.J. was claiming sexual things happened between them. Esparza asked if it was "possible" that M.J. touched defendant first, and defendant responded, "Possibly? I don't remember." He then said "[i]f" it happened, "it would be in the car." Defendant said he remembered one time where M.J. reached over to give him a hug. M.J. "may" have touched him on the thigh at that point. When asked if it was possible M.J. ever touched his penis, defendant said, "Anything's possible." He later said, "If it happened, I don't wanna remember it."

Defendant initially denied ever going to a lake with M.J. Later, he said they went to the lake with Savannah, M.J., and others. He denied touching M.J.'s breast over her shirt at the lake.

---

[5] *Miranda v. Arizona* (1966) 384 U.S. 436.

[6] Again, the trial court advised the jury that the recording of the interrogation was the evidence, not the transcript. However, both parties cite to the transcript, and we will do so as well.

Esparza told defendant that M.J. said "things happened" on the route to an orchard area near her house and asked if anything ever happened "on the way over there?" Defendant responded, "I don't know."

Esparza asked defendant, "Maybe as you guys are rolling down the road and—and driving, is she coming on to you?" Defendant responded, "I don't remember." Esparza asked if it was a possibility to which defendant said, "The possibility of it." However, defendant denied that M.J. ever gave him a "hand job," that her mouth touched him "down there," or that his mouth touched her breast or vagina.

Later, defendant said sexual things might have happened, but he never touched M.J. When asked to explain the sexual things, defendant said he did not remember. But defendant said, "I'm not gonna flat out deny it because, okay, it might'd happened, but I don't remember it." When asked if he regretted the sexual things that happened, defendant said, "Yeah. If they happened, you know." Defendant then denied that sexual things happened between him and M.J.

Defendant did not want to hear more of M.J.'s accusations because they made him "sick" because he knew it should not have happened. But defendant then immediately claimed he knew "it didn't happen."

Defendant eventually said he "may" have "flicked" M.J.'s breast. Defendant said M.J. was sitting on top of him and he would "move her breast." When asked why he moved her breast, defendant said, "Just because."

Later, when discussing M.J.'s accusations in general, defendant said he "didn't do 90% of it, that's for damn sure." Esparza responded, "Okay. So maybe just 10% of those sexual things?" Defendant responded, "Yeah." Defendant said he did not remember "exactly what" those sexual things were.

Defendant denied having HPV and said he did not know how she could have gotten it from him.

8.

When asked if defendant's wife may have seen any sexual incidents between him and M.J., defendant said she might have seen defendant and M.J. wrestling, but nothing sexual. Defendant explained he and M.J. would wrestle while standing up.

*Further Investigation*

Esparza contacted M.J.'s doctor and learned she in fact did not have HPV. Esparza did not confront M.J. with this fact.

M.J. said her brother had seen "something" yet the police reports did not document any conversation Esparza had with the brother. Esparza "want[ed] to say" he did in fact speak with the brother, but acknowledged it was not documented in his reports and that is something he would have documented.

Esparza did not have M.J. submit to a sexual assault examination nor have DNA collected from her body. Sexual assault examinations should usually occur within seven to 10 days of an alleged assault, yet M.J. had indicated the last incident occurred months prior.

*Stipulation*

The parties entered into the following stipulation, which was read to the jury:

> "On April 1st, 1999, the defendant, James Mills, was sentenced after pleading guilty to violating … [s]ection 288[, subdivision] (a) in the Superior Court, County of Tulare, Case Number 41454. The crime involved more than one victim."

**DISCUSSION**

I. **Defendant Forfeited his Claim of Prosecutorial Error by Failing to Object Below**

Defendant claims the prosecutor prejudicially erred by talking about common reactions children have to sexual abuse during closing argument. He contends these statements mirrored factors that comprise what is commonly referred to as child sexual abuse accommodation syndrome, or CSAAS, which required expert testimony. The

9.

Attorney General contends defendant forfeited this claim by failing to object below, and we agree.

CSAAS is a set of "common stress reactions of children who have been sexually molested .…" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300.) "The CSAAS model has five components: (1) secrecy, (2) helplessness, (3) accommodation, (4) delayed disclosure, and (5) retraction." (*People v. Hernandez* (2011) 200 Cal.App.4th 953, 962.) One CSAAS expert explained the factors this way:

> " 'Secrecy' comes first because most child sexual abuse happens in secret. The longer the secret continues, 'the more the child feels like an accomplice rather than a victim. They start to feel more guilty. They start to feel blame. The more the child feels that, the more they'll keep the secret.' 'Helplessness' refers to the child's physical helplessness and inability to fight back. It also refers to the notion that children are raised to obey adults and, as a result may feel uncomfortable saying no to an abusive adult. 'Accommodation' is the notion that, if children feel helpless, they adapt in order to make the abuse more tolerable. For example, a child may pretend to be asleep during the abuse or pretend something is not actually happening. Many victims continue displaying affection toward their abuser, especially if he or she is a family member. 'Delayed disclosure' reflects the fact that most abuse victims do not immediately disclose the abuse and, when they do, reveal only small details to see if the person to whom the information is disclosed is supportive. If not, the victim will most likely shut down. 'Retraction' occurs when a child discloses the abuse and then, when familial support is lacking, takes 'back what they said in hopes of making the bad stuff that happened go away.' " (*People v. Hernandez*, *supra*, 200 Cal.App.4th at p. 962.)

Expert testimony on CSAAS is not admissible to prove that sexual abuse actually occurred. (*People v. Munch* (2020) 52 Cal.App.5th 464, 468.) Instead, it " 'is admissible to rehabilitate [the alleged victim's] credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation.' " (*Id*. at p. 466.)

*Analysis*

Here, defendant contends that aspects of the prosecutor's argument "mirror[ed]" the CSAAS factors even though no CSAAS expert testified at trial.

In closing argument, the prosecutor stated:

"One of the considerations I want you to think about when you consider [M.J.] in the situation she was in at 12 years old and through her 13th year when she was dealing with the abuse by the defendant. One of those was the concept of secrecy. We know she waited years to report what the defendant had been doing to her. About six months after the last time anything happened, is when she finally told her mom what was going on.

"I want you to consider the relationship between [M.J.] and the defendant. She talked about how he would threaten her that very first time and said if you say something, I'll hurt your mom or her grandmother. And that caused fear for [M.J.] Whether that was real or not that he would actually do those acts, it was that overt and intimidating relationship that he had with her. Not only was he in a position of someone of authority, being an older family member, he was related to her. Common sense. He's bigger than her. He's stronger than her.

"You talk about the manipulation that goes into crimes like this, the shame, the humiliation, the fear of being judged by what's happening by the fact of an older person much older than you is abusing you in a sexual manner, knowing that's not right.… [T]hat's wrong. There's a stigma that is attached to those types of acts that someone is going through. Even with opportunity, victims don't always disclose.

"Savannah taught [M.J.] about good touch, bad touch. Savannah taught her to tell her if something was happening to her. Did that matter to her? No.

"Savannah talked about her own experience as a child, suffering abuse by a family member. She waited many years to finally disclose what happened to her, what those experiences were. And she never even told the police.

"Then we have this feeling of helplessness that [M.J.] most likely felt and experienced when all of this was going on. There's a huge misconception if you are being abused, you are going to immediately run and tell someone. Not only did the feelings of secrecy and humiliation and shame that I just talked about come into play, but you have that ongoing

11.

relationship that prevents that between [M.J.] and the defendant. They weren't close. They didn't spend a ton of time together, but he was there at family gatherings. He was there at her great grandma's house. He's related to her grandmother. He's at the Thanksgiving dinner table with [M.J.] It ties into not wanting to talk about that abuse, whether it be with friends, family members, or law enforcement.

"And kids don't always have a lot of freedom to do things and to act out in these situations. [M.J.] talked to you a little bit about her home life. I didn't go into that extensively with her. She told you she had older brothers, a younger brother, and a sister. That's five children in that household. Her grandmother has custody of her for whatever reasons. Her mom is there. Not always in the home, but mostly she's in the home. They don't have a lot of money. They don't have a lot of resources. So [M.J.] understands that to some extent, even being 12 and 13 years old, she doesn't have a lot of freedom in the situation that she's in. She has that reliance on that authority figure that the defendant might not have had authority over her to make sure she went to school or didn't act out, but he is still that type of person in [M.J.]'s life.

"Then we have to think about this concept of her being trapped and how she's going to compensate for that. How she's going to get over that. She was stuck. [M.J.] was stuck in her home life. Stuck in these feelings of how do you deal with this shame. How do I deal with knowing if I go over there, the abuse may continue? And it is extremely sad to think that maybe $20 to use on a field trip was the cost of [M.J.]'s innocence, but for [M.J.], that was her reality.

"There's a concept of disassociation. What that means is that when you are going through these things, you may not like what's happening. You may know it is wrong. You may not want it to happen, so you disconnect with the bad feelings of it. You go because your mom tells you to go. Maybe she needs a break from you. Maybe you need to get an extra couple bucks so you can spend it on a bag of chips or soda when you go on a field trip with classmates. But shutting down those feelings makes you able to cope.

"It's not unusual to be around the perpetrator or being forced to be with the perpetrator and being forced to not act out against that because you know if you do, there's some reason you are not going to say anything. For [M.J.], she was afraid that something would happen to her mom. She was afraid that something would happen to her grandmother. [M.J.]'s home life was not great. She talked about that fear of being taken away from her mom. For people thinking that her mom was not a good mom. She has

12.

obviously some involvement with CWS in that household and in that family, and she didn't want anything that she had to say about the defendant to impact the home life that she knew and that she wanted with her mom.

"Now, when it comes to [M.J.]'s disclosure, there's this concept of delayed—what we call sometimes an unconvincing disclosure, because you have that fear of what's happening. And as we all sit in this courtroom today, we are all adults. We have some awareness of how things progress, but at 12, a child does not have the same mentality as grown adults sitting in this courtroom listening to the evidence that we have. A child doesn't always see the options or the way out.

"And another thing to remember is that kids are not always great with the intangibles. Kids aren't always great with whether something happened a week ago, a month ago, or six days ago, or 14 hours ago, or back in July. They don't have a concept of that. So then you see that they talk about things in a way, and they mark it by right after I turned 12. It was stopped before I turned 14.

"I can't remember exactly what day this happened, but I know it happened in an orchard. I can't remember what happened each specific day, but I know that it happened generally in the same manner. The same way every single time that it did happen, whether we would be going or coming from his house. He would pull over and stop the car and the same type of acts would occur each time. So the multiple instances of abuse factor greatly into those types of intangibles and ability to recall those specific types of details. And it is hard to distinguish what happened each specific time."

A defendant forfeits a claim of prosecutorial error unless he objects in the trial court. (See *People v. Lepere* (2023) 91 Cal.App.5th 727, 736, 738; *People v. Fernandez* (2013) 216 Cal.App.4th 540, 560–561; *People v. Mesa* (2006) 144 Cal.App.4th 1000, 1006–1007.) Defendant concedes that counsel did not object to the prosecutor's references to information similar to CSAAS. Consequently, we find the claim forfeited. We decline defendant's invitation to overlook the forfeiture.

## II. Defendant has not Established Ineffective Assistance of Counsel

Defendant's next claim is that he received ineffective assistance of counsel due to counsel's "failure" to object to the prosecutor's closing argument.

13.

" 'Ineffective assistance of counsel under the Sixth Amendment entails deficient performance under an objective standard of professional reasonableness and prejudice under a similarly objective standard of a reasonable probability of a more favorable outcome in the absence of the deficient performance.' " (*People v. Medina* (2009) 171 Cal.App.4th 805, 819.)

If the alleged deficiency concerns tactical decisions, appellate courts generally defer to counsel. (See *People v. Orloff* (2016) 2 Cal.App.5th 947, 955.) " ' " '[W]e have explained that "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" [citation]. "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." ' " [Citation.]' " (*Ibid.*) " 'In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions. [Citations.]' " (*Ibid.*)

" '[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' " (*People v. Lopez* (2008) 42 Cal.4th 960, 972.)

*Analysis*

Here, there is a conceivable reason for the lack of objection by counsel: she did not want to draw the jury's attention to this portion of the prosecutor's argument. (See *People v. Huggins* (2006) 38 Cal.4th 175, 206; *People v. Padilla* (1995) 11 Cal.4th 891, 947–948, 957, overruled on other grounds by *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1; *People v. Ghent* (1987) 43 Cal.3d 739, 772–773.)

Moreover, defense counsel may have figured that an objection would not have accomplished much in return for the cost of highlighting the objectionable content. While CSAAS itself requires expert testimony, much of it overlaps with the commonsense observations prosecutors often make about witness credibility, even in the absence of underlying expert testimony. For example, when discussing "unconvincing

14.

disclosure," the prosecutor referenced M.J.'s inability to recall specific dates but remembering the location (i.e., the orchard), and noted that children sometimes struggle remembering exactly how long ago something occurred.[7] Similarly, the prosecutor's observation that a child might not disclose something out of fear of harm to a loved one is a commonsense observation that did not require a CSAAS expert.

Defendant cites *People v. Centeno* (2014) 60 Cal.4th 659 in urging us to find counsel's performance deficient. But in that case, the People only offered two possible tactical reasons for the lack of objection by defense counsel to the prosecutor's improper argument on the reasonable doubt standard: (1) the prosecutor's argument was nonresponsive to the defense's argument and therefore a waste of time anyway, and (2) the prosecutor's argument actually heightened the prosecutor's own burden of proof. (*Id.* at p. 675.) We, however, rely on a different conceivable reason: a desire not to highlight the prosecutor's argument in front of the jury. Since *Centeno*—and all other decisions for that matter—is not authority for propositions not considered (*People v. Ault* (2004) 33 Cal.4th 1250, 1268, fn. 10), we see no reason to depart from the cases that have held this is a conceivable reasonable explanation for counsel's tactical decision. (See *People v. Huggins*, *supra*, 38 Cal.4th at p. 206; *People v. Padilla*, *supra*, 11 Cal.4th at pp. 947–948, 957, overruled on other grounds by *People v. Hill*, *supra*, 17 Cal.4th at p. 823, fn. 1; *People v. Ghent*, *supra*, 43 Cal.3d at pp. 772–773.)

Because there is a conceivable, reasonable tactical explanation for the lack of objection, defendant cannot prevail on this claim on direct appeal.

---

**7**      On the other hand, the prosecutor's references to things like victims "disassociat[ing]" from unpleasant emotions during abuse probably did require underlying expert testimony. Our only point is that an objection would not have precluded all of the prosecutor's statements, and that fact could have affected counsel's tactical decision.

### III. Trial Court Erred in Sentencing Defendant Under Section 667.61 on Count 2

On count 2, the jury acquitted on the charged offense but convicted on the lesser included offense of attempted lewd act upon a child. At sentencing, the trial court imposed a consecutive sentence of 25 years to life on this conviction "pursuant to … [s]ection[s] 667.61 and 1170.12."

Defendant contends, and the Attorney General concedes, that this sentence was error because section 667.61 does not apply to attempted lewd act upon a child. We accept the concession.

With certain enumerated exceptions, section 667.61 provides for prison terms of 25 years to life for certain crimes committed under certain circumstances. (§ 667.61, subd. (a).) While lewd and lascivious acts under section 288 is one of the enumerated crimes, *attempted* lewd and lascivious acts is not. Consequently, the trial court erred in sentencing defendant on count 2 "pursuant to" section 667.61. Accordingly, we will remand for resentencing.

### IV. At Resentencing, the Trial Court Must Not Impose a Fine Under Section 294, Subdivision (b)

Defendant urges that we strike the fine imposed under section 294, subdivision (b), and the Attorney General "does not object."

Section 294, subdivision (b), authorizes a restitution fine "[u]pon conviction … for violation of Section 261, 264.1, 285, 286, 287, or 289 …." (§ 294, subd. (b).) However, defendant was not convicted under any of those sections. Consequently, at resentencing on remand, the trial court must not impose a restitution fine under this subdivision.

## DISPOSITION

The sentence is reversed and the matter remanded for full resentencing.  In all other respects, the judgment is affirmed.


GUERRA, J.†

WE CONCUR:


HILL, P. J.


LEVY, J.

---

†      Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.